(10 Misc. Rep. 77.)

### PEOPLE ex rel. WARREN v. BECK, Sheriff.

(Superior Court of Buffalo, General Term.    October 8, 1894.)

CONSTITUTIONAL LAW—RESTRICTING HOURS OF WORK.

Laws 1891, c. 105, § 504, which forbids contractors for city work in the city of Buffalo to accept more than eight hours for a day's work, except in cases of necessity, does not "abridge the privileges of citizens" (Const. U. S. art. 14, § 1), or deprive any citizen of his rights or privileges (Const. N. Y. art. 1, § 1).    White, J., dissenting.

Appeal from special term.

Application by Henry J. Warren for a writ of habeas corpus to August Beck, sheriff.    The writ was granted, but was afterwards vacated, and relator appeals.    Affirmed.

Argued before HATCH and WHITE, JJ.

Frank R. Perkins and John G. Milburn, for appellant.

Daniel J. Kenefick, for respondent.

HATCH, J.    When this case was before the general term of the supreme court on an appeal from the judgment of conviction, that court reached the conclusion that the statute in question was a valid exercise of legislative power.    People v. Warren, 77 Hun, 120, 28 N. Y. Supp. 303.    I concur in that opinion, and would not now deem it necessary to add anything further to the discussion did not my associate take a radically different view of the question involved. I do not understand that the views expressed by the supreme court respecting the obligations and rights of employer and employé and the relation of each to the state are questioned.    But the claim is that such rules have been misapplied.    It was decided in U. S. v. Martin, 94 U. S. 400, that the government had the right to determine the number of hours which should constitute a day's labor for its employés, and that a statute which fixed the number of hours was to be regarded as forming the basis for all labor contracts made with the government, and constituted a direction by the government, as principal, to its agents.    The statute then under consideration did not prohibit a contract for more hours of service in a day, and it was held that such was not its intention; that no change in the law respecting the right of parties to contract was contemplated, and that a contract for more hours of service than the statutory period was valid.    The importance of the decision, as applied to the facts here, is the recognition of the right that the government has the power to determine what hours, for it, shall constitute a day's labor.    The principle did not need an authority to support it, but it was made more sure of application by judicial recognition.    If the government has the power of determination in this regard, then it must follow that it has also the power to make its determination effective, and provide by penalty the enforcement of the law.    This is the ordinary and frequent exercise of governmental power.    Consequently all agents of the government become subject to the penalty if they infringe the law.    Does this in any wise interfere

with the laborer? Is his right above the conceded power of government in this respect? His right is the right to offer his labor in the market equally with every other laborer of his class, and no more. If he offer it to the government, he knows what terms the government has prescribed; and if he is not willing to accede to those terms he may not be compelled thereto. But where does the power reside, or did it ever reside, in the law, which will compel the government to change its terms to compliance with what the laborer demands? His right is presently, at the place where he offers his labor, but it is subject to the rights of the party, at the same time and place, to whom the labor is offered. It seems to follow, therefore, that between the government and the laborer a law which prescribes the hours that shall constitute a day's work, and prohibits by penalty its violation, infringes upon no right possessed by either.

It is said that defendant is an independent contractor, and consequently the rules we have invoked have no application to the case. If this were conceded, it might not be possible to answer the claim. But the assertion itself, as I view the facts, is far from being true. In the sense that the defendant is doing work for the city of Buffalo under a contract to furnish all material and labor in making a public improvement for a given sum, it is the fact; but that it is relieved from the obligations imposed by the statute upon the city of Buffalo, and assumed by it, is not true as matter of law. Had the city itself performed this work, it would have been within the rule we have announced, and subject to the obligations imposed by the law. How can the defendant plead exemption from such statute, when it has voluntarily, in terms, incorporated it in its contract, and agreed to be bound by and carry out its terms? The city said to the defendant, and to all other contractors, when it invited bids for the performance of the work: "The statute is one of the conditions which must be complied with, and an obligation which must be assumed by the contracting party." The defendant was not obliged to bid. The conditions imposed applied equally to all who should bid. The act of bidding was with full knowledge and voluntary. Under these conditions defendant made its bid, and, when awarded the contract, voluntarily executed the same, and assumed the obligations imposed upon the city by the statute. How can it be said that he was an independent contractor, freed of obligations? He was an independent contractor, but he is not independent of the obligations imposed by the contract. He has chosen to substitute himself in the place and stead of the city in this regard, and therefore becomes subject to the same obligations and duties which the law imposed upon it. Defendant, by bidding and accepting the contract, became the recipient of all the benefits which accrued therefrom, and he should not now be heard in repudiation of lawful obligations assumed thereby. It is said in Bertholf v. O'Reilly, 74 N. Y. 517:

"A party cannot object upon constitutional grounds to a liability which he has voluntarily assumed, in consideration of a benefit conferred; and one may renounce even a constitutional provision made for his own benefit."

The reasoning of this case, in principle, is decisive of the claim that defendant is relieved by reason of his independent character. I see no reason for departing from the result reached by the supreme court.     The order appealed from should therefore be affirmed.

WHITE, J. (dissenting).     The Barber Asphalt Paving Company is a West Virginia corporation engaged in the business of paving streets in the city of Buffalo, under contracts with it, and the relator is the superintendent of the paving company.     In the fall of 1893 the paving company was paving Delaware avenue, one of the public streets of the city, under a contract with the city, which, in compliance with the charter, contained a provision that the company should employ only citizens of the United States, or those who had legally applied for citizenship, and were permanent residents of the city of Buffalo, as laborers in paving said street; and, further, that it (the company) should not accept more than 8 hours as a day's work to be performed by its laborers within nine consecutive hours; and, further still, that it would not employ any man or set of men for more than 8 hours in 24 consecutive hours, except in case of necessity. The relator hired and discharged the laborers of the company.     During the progress of the work he hired one Brown to work, and Brown did work for the company as a laborer for more than 8 hours in 9 consecutive hours, and for more than 8 hours in 24 consecutive hours, to wit, for 10 hours in 24 consecutive hours, and not in a case of necessity.     The relator and Brown were both citizens of the United States, and permanent residents of the city of Buffalo.     It is for thus employing Brown that the relator has been adjudged to be guilty of a crime, and is now suffering imprisonment.     As the charter prescribes no penalty for its violation, section 155 of the Penal Code, as the respondent claims, characterizes the offense as a misdemeanor.     The sole question presented for our consideration is whether or not the provision of the charter above referred to conflicts with our national and state constitutions.     The constitution of the United States provides that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; and our state constitution provides that no member of this state shall be deprived of any of the rights or privileges secured to citizens thereof, unless by the law of the land or the judgment of his peers.     Neither instrument defines in terms all the privileges and immunities possessed by citizens, nor will the courts attempt to define them in any general way, but will deal with each case on a consideration of its particular facts when it is presented. Conner v. Elliott, 18 How. 591; 2 Story, Const. p. 685.     The rights and privileges thus guarantied, but not defined, therefore, are not created by, but exist independent of, constitutional law.     The provision that no member of the state shall be deprived of such a right or privilege, except by the law of the land or the judgment of his peers, means only that it cannot be taken from him, nor be declared forfeited, without a proceeding for that purpose, conducted in accordance with the forms and methods and by the means prescribed for the enforcement of law.     No such right can be taken from a

member of the state by legislation alone.    People v. Gallagher, 93 N. Y. 438.    "The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable.    The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper without injury to his neighbor is a plain violation of this most sacred property.    It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him.    *    *    *    I hold that the liberty of pursuit, the right to follow any of the ordinary callings of life, is one of the privileges of a citizen of the United States of which he cannot be deprived without invading his right to liberty within the meaning of the constitution."    Such is the language used by Justice Field of the United States supreme court in the case of Butchers' Union Slaughterhouse Co. v. Crescent City Live-Stock Landing Co., 111 U. S. 746, 4 Sup. Ct. 652.    In the case of U. S. v. Martin, 94 U. S. 400, cited in the opinion which prevails in disposing of this appeal, Mr. Justice Hunt, of the same court, says, in substance, that except in certain business, and persons subject to the police power of the state, principals are entitled to employ whom they will on terms agreeable to the parties. The police power in the state is nothing more or less than the right of the state to protect its members from harm, and to promote the welfare of the community, even though the exercise of that power may involve the destruction of private rights.    It is by virtue of this police power that the legislature assumes to regulate the hours of labor of those engaged in operating railroad trains and street cars, of women and children in certain industries, and the like, and to regulate and control business operations to the end that the health, morals, and safety of the community may be promoted.    The respondent invokes this power in support of the legislation which we are now considering, but, in my judgment, no fact is or can be stated proving that labor such as Brown performed for the relator for more than 8 hours of the 24 each day has ever endangered, or will ever endanger, the health, safety, or welfare of the community, or of those engaged in such labor.    On the contrary, observation and experience assure us that it is one of the "ordinary callings of life," and "innocuous" in itself.

We think it is common knowledge that the great mass of our citizens who represent the bone and sinew, the intelligence and patriotism, of the nation, labor more than eight hours a day in the "ordinary callings of life;" that the great majority cherish the privilege so to labor as above all price, and may rightfully regard any abridgment of it as an infringement of their right.    If the business of laying pavements in our streets can be said to be nocuous, or that, if it is not regulated and controlled by the legislature, the lives, health, or welfare of those engaged in it, or the welfare in general of society, will be endangered thereby, it will be exceedingly difficult to name any calling of life that should not be thus regulated and controlled.    With equal propriety such legislation may be extended to all classes of workers, and for all practical purposes that

includes our entire population. If the case at bar is subject to the police power of the state, there would seem to be no valid reason why toilers in all fields of productive labor, manual and intellectual, without discrimination, should not be subject to and controlled by the same power. Honest toil in an "ordinary calling of life," like that of laying pavement in the open air, will never endanger the life, health, or morals of the community. On the contrary, they will be promoted by it. A desire to profit by laboring to the extent of one's ability induces the cultivation of thrift, prudence, sobriety, economy, foresight, intelligence, and morality, and those virtues distinguish the great mass of workers in our country. Neither disease, ignorance, crime, nor the necessity for bread at the hands of the state among those who labor comes as a rule from that liberty by virtue of which every member of the state is permitted to exercise all his faculties to their full extent in competition with his fellows in all fields of honest labor without let or hindrance. Legislation such as we are now considering tends to create a class of statutory laborers, so to speak, in which the standard of ability to earn money shall be uniform, and measured by that of the weakest, most ignorant, debased, and inefficient one in the class. It is said that the men who are the greatest users of capital, the men in whom superior intellect and will are united, come from labor's own ranks, and that, as a consequence, capital is forever changing hands. The legislation in question conflicts with the operation of that wholesome natural law. It can be enforced only by sacrificing the freedom of the laborer. To put forth effort for the accomplishment of useful ends and the happiness of himself is the mission and destiny of man. As man, and independent of the accidents of birth, it was intended that he should be, and he is, compelled by the law of necessity, which is the law of his being, to utilize and exercise his faculties and powers to procure shelter, food, and raiment; and it is only by a continuous struggle, and in consequence of repeated failures and mistakes, that he can hope to become what he was designed to be, namely, an intelligent, self-reliant, and morally responsible being. It cannot be expected that all men, even of the class particularly affected by the provision of our charter in question here, will advance with equal rapidity in the social scale. Different degrees of intelligence, strength, cleverness, and honesty must distinguish them. Preventing the exercise of his ability to the utmost by any member of the class for his own benefit and advancement, by pains and penalties, is a crime against labor. Possibly, in the absence of legislation like that under consideration, some of the individuals sought to be benefited will be deprived wholly or in part of an opportunity to labor; possibly emigration of the whole or a portion of those individuals to other fields of usefulness may become a necessity; possibly immigration of the inefficient and incapable from other lands will decrease. But better all of these things than that the people themselves shall violate the organic law of their existence as a nation to the prejudice of its worthy citizens.

In considering this case upon its merits I am not unmindful of the fact that our supreme court has held the legislation in question to be

constitutional, but the conviction is so strong in my mind that the conclusion reached by that court is at variance with controlling decisions of other courts whose opinions, like its own, are universally respected, that I have ventured, at the risk of being charged with rashness, to record my convictions in the premises.   Nor am I unmindful of the fact that law is founded largely upon precedents, and that ordinarily, when a rule has been once deliberately adopted and declared, it ought not to be disturbed, unless by a court of appeal or review, and never by the same court, except for very cogent reasons, and upon a clear manifestation of error; but I am clearly of the opinion that whenever the court is satisfied that its own or the decision of a co-ordinate court is erroneous, it should not hesitate to correct the decision which it deems erroneous, and especially, as in this case, when no right of person or property can be prejudiced thereby.   In its opinion in this case the supreme court asserts with great force and clearness in a general way the right of the citizen to labor without interference on the part of the state, but says that the city of Buffalo has debarred itself, and all independent contractors with it, of the right to accept more than eight hours as a day's work, by virtue of the provisions in its charter, and that a violation of those provisions by such independent contractor makes him a criminal.   According to that opinion, the reason why those provisions of the charter are valid, and thus make a criminal of the contractor, is because—

"By means of the statute in question the hours of employment of laborers on contract work for the city of Buffalo are fixed on the part of the city, and it remains for the laborer seeking employment to accept or refuse those terms. If he insists upon working more than eight hours a day, he may seek other employment, either for the whole or for the excess of his time.   His liberty of choice is not interfered with, nor his right to labor infringed."

The sense of the statement is that, because a laborer is not compelled to work in the field referred to at all, unless he voluntarily chooses to do so, his liberty of choice is not interfered with, nor his right to labor infringed.   The conclusion reached does not seem to me to logically follow the premises upon which it is based.   By the charter the contractor is prohibited, on pain of fine and imprisonment, from accepting more than eight hours as a day's work; and the laborer is prohibited, under a like penalty, from working more than eight hours a day.   In exercising their liberty of choice, Brown worked, and the relator accepted, more than eight hours a day as a day's work; and it is in consequence of having exercised their liberty of choice that the statute has been violated, and the relator is imprisoned.   How, then, can it be said that the liberty of choice has not been interfered with?   To say that Brown was at liberty to find work in other fields does not, as it seems to me, meet the case. His right is to labor in fields of his choice, so long as his employer chooses to employ him there, and he does not interfere with the equal right of others.   The statement of the case by the supreme court itself makes it plain to my mind that the liberty of choice as to the relator and Brown is interfered with by these provisions in the charter.   The only authority relied upon by the supreme court

as a precedent for its decision is chapter 352 of the Laws of the United States passed in 1892, and the case of U. S. v. Ollinger, 55 Fed. 959. It says the provisions of that statute are precisely similar to the provisions of the charter which we are considering. Ollinger took from the government a contract to construct two stone barges, and in building the barges he permitted and required his laborers and mechanics engaged in building them to work more than eight hours a day. An information for violation of the statute was laid against him, and the court held that he was not subject to the provisions of the statute, for the reason that he was an independent contractor with the government, and that the statute was intended to apply only to persons owing a duty to the government in the execution of the work under the contract. In the case at bar, the relator, or his principal, the Barber Asphalt Paving Company, was an independent contractor, owing no duty to the city of Buffalo except to perform its contract according to its terms, and in its own way, and free from dictation or control by the city or any of its officials. The rights of the paving company, notwithstanding it was a foreign corporation, are the same as those of a resident citizen. Santa Clara Co. v. Southern Pac. R. Co., 118 U. S. 394, 6 Sup. Ct. 1132. On principle, then, as it seems to me, the Ollinger Case, in so far as it is applicable to the case in hand, supports the contention of the appellant. The facts in the two cases are quite as similar as the statutes under which they arose. In each case the work was being done by an independent contractor,—in the one case for the United States government and in the other for the city of Buffalo. That the paving company was an independent contractor with the city does not seem to be open to question now. Its duties and obligations were measured by the terms of its contract. Of course, it was not independent of the obligations imposed by the contract, but, if those obligations were in violation of constitutional law, they were without force. The contention of the appellant is that, those obligations being illegal and without force, a disregard of them by the relator would not constitute a crime, and I think that contention is sound. The right in question here is inalienable wherever it exists. While it is perfectly true that any man may ordinarily waive the benefit of a provision of law in his favor, it is equally true that there are certain provisions of law in his favor that he cannot waive or barter away, and among them is the "right of pursuit," as it is called. People v. Gillson, 109 N. Y. 389, 17 N. E. 343. In the case at bar the supreme court did not rest its decision upon the police power of the state to control labor dangerous to its welfare, but squarely upon the assumption that the charter does not in terms interfere with the laborer's liberty of choice, nor infringe his rights to labor for an independent contractor with the city of Buffalo. That question, of course, must be determined by a construction of the language used in the charter. I think it will bear only such a construction as we have already indicated; and, assuming that it is not a case for the exercise of the police power of the state, it seems clear to me that the cases of People v. Marx, 99 N. Y. 386, 2 N. E. 29, and Jacob's Case, 98 N. Y. 107, and others like them, are germane

to a discussion of the case at bar. In my opinion, those provisions in the charter of the city of Buffalo which forbid the acceptance by an independent contractor with the city of more than 8 hours of work in 24 consecutive hours at the hands of his laborers in the business of constructing pavements in public streets, they and he being citizens of the United States and members of this state, are in conflict with our state constitution, and void. The order appealed from should be reversed, and, as only a question of law is raised by the writ of habeas corpus and the return thereto, the relator should be discharged from imprisonment.