[No. 9964. *En Banc.* December 31, 1913.]

C. E. MALETTE, *Appellant,* v. THE CITY OF SPOKANE, *Respondent.*[1]

MUNICIPAL CORPORATIONS—PUBLIC IMPROVEMENTS—WAGES—MINIMUM WAGE—AUTHORITY TO FIX. The legislative body of a city of the first class has the power to prescribe a higher rate of wages than the prevailing rate, as a minimum of wages to be paid for common labor on public work to be paid for by special assessments against property specially benefited, in view of Const., art. 11, §§ 10, 11, conferring the largest measure of local self government compatible with the general authority of the state, and Rem. & Bal. Code, §§ 7518 and 7507, conferring general authority to exercise all usual powers, whether specified or not, and to make all regulations necessary for the preservation of health and good order in its limits.

[1]Reported in 137 Pac. 496.

SAME—PUBLIC IMPROVEMENTS—SPECIAL ASSESSMENTS—CONTROL—
MINIMUM WAGE. Street improvement work, to be paid for by special assessments, is public work, regardless of the mode of payment,
and therefore within the control of the public authorities as to the
minimum wages to be paid for common labor thereon.

SAME—IMPROVEMENTS—MINIMUM WAGE—ORDINANCE—VALIDITY—
PUBLIC POLICY. An ordinance prescribing a higher rate of wages
than the prevailing rate, as a minimum of wages to be paid for
common labor on public work to be paid for by special assessments
against property specially benefited, is not contrary to any public
policy of the state, even if it increases the cost of the work.

SAME—IMPROVEMENTS—ASSESSMENTS—PUBLIC OR PRIVATE WORK—
AGENCY OF CITY—MINIMUM WAGE. In the improvement of streets,
at the expense of the property specially benefited, a city does not
act in its proprietary capacity or as an agent of the owner whose
property is assessed to pay for the work, so as to make the work
private work and not subject to the minimum wage law provided
for public work; but rather in its governmental capacity to open
and improve streets, and as the agent of the law in letting the contract and collecting the assessment.

SAME—PUBLIC IMPROVEMENTS—CONTRACTS—METHOD—PUBLIC BIDS.
Under Rem. & Bal. Code, §§ 7507, 7560, and 7567, providing that
cities of the first class may provide for making local improvements
to be paid for by special assessments, to determine what work shall
be done in whole or in part at the expense of the property benefited, and to provide for the manner of making and collecting the
assessments, the city is not required to let the contracts upon competitive bids, in the absence of any statute or charter requirement
so directing.

SAME—PUBLIC IMPROVEMENTS — ORDINANCES — MINIMUM WAGE—
REASONABLENESS. There is a presumption of the reasonableness of
an ordinance prescribing a higher rate of wages than the prevailing
rate, as a minimum of wages to be paid for common labor on public
work to be paid for by special assessments against property specially
benefited; and taking notice of existing conditions and circumstances
and the increased cost of living during the past few years, the courts
cannot say that an ordinance is unreasonable in fixing a minimum
wage of $2.75 per day for common laborers on street improvement
work, payable from special assessments upon property benefited.

GOSE, CHADWICK, and MOUNT, JJ., dissent.

Appeal from a judgment of the superior court for Spokane
county, Sullivan, J., entered July 1, 1911, overruling objections of a property owner to an assessment for a local improvement, upon appeal from the city council. Affirmed.

*Voorhees & Canfield*, for appellant.

*H. M. Stephens, A. M. Craven, Wm. E. Richardson*, and *E. E. Sargeant*, for respondent.

*Alex M. Winston*, amicus curiae.

ON REHEARING.

ELLIS, J.—The facts out of which this controversy arose are stated in the opinion on the first hearing (*Malette v. Spokane*, 68 Wash. 578, 123 Pac. 1005) ; but, in order to present a single, comprehensive review of the case, we deem it not amiss to restate them.

The legislature, in 1899, passed an act declaring that "hereafter eight hours in any calendar day shall constitute a day's work on any work done for the state or any county or municipality within the state" (Rem. & Bal. Code, § 6572; [P. C. 291 § 115]) ; and provided that,

"All work done by contract or subcontract on any building or improvements or works on roads, bridges, streets, alleys or buildings for the state, or any county or municipality within the state, shall be done under the provisions of this act: Provided, that in cases of extraordinary emergency, such as danger to life or property, the hours for work may be extended, but in such case the rate of pay for time employed in excess of eight hours of each calendar day, shall be one and one-half times the rate of pay allowed for the same amount of time during eight hours' service. And for this purpose, this act is made a part of all contracts, subcontracts or agreements for work done for the state or any county or municipality within the state." Rem. & Bal. Code, § 6573 (P. C. 291 § 116).

The act further declared any one violating its provisions guilty of a misdemeanor and, upon conviction, subject to a prescribed punishment. Rem. & Bal. Code, § 6574. In 1903, another act was passed, declaring that:

"It is a part of the public policy of the state of Washington that all work 'by contract or day labor done' for it, or any political subdivision created by its laws, shall be per-

formed in work days of not more than eight hours each, except in cases of extraordinary emergency" (Rem. & Bal. Code, § 6575 [P. C. 291 § 117]) ;

and that all contracts for such work should provide that they might be cancelled by the officers of the state, county, or city having supervision of the work, in case of a violation of the statute (Rem. & Bal. Code, § 6576; P. C. 291 § 119) ; and making it the duty of such officers to incorporate in all such contracts stipulations "as provided for in this act," and "to declare any contract canceled the execution of which is not in accordance with the public policy of this state as herein declared." Rem. & Bal. Code, § 6577 (P. C. 291 § 121).

In pursuance of the public policy of the state so declared, the city of Spokane, on August 24, 1909, by ordinance No. A4422, so far as here material, provided that:

"Section 1. Hereafter eight (8) hours in any calendar day shall constitute a day's work on any work done for the city of Spokane, subject to the conditions hereinafter provided.

"Section 2. Hereafter all laborers employed by the day on municipal work, either directly by the city or by contractors, subcontractors, individuals, partnerships, associations or corporations, on all work for the city, shall receive and be paid not less than $2.75 for a calendar day's work of eight (8) hours. The provisions of this section shall apply to, and govern all work done for the city of Spokane and all work for any individual, firm, partnership, association or corporation which is done under the direction or under the supervision of, or which is to be accepted by the city of Spokane or any officer or agent thereof."

The ordinance further provided that, in cases of emergency, the hours for work might be extended, but that the rate of pay for excess time should be one and one-half times the rate allowed for the same amount of time during the eight hours service, and that the ordinance be made a part of all contracts thereafter made. By express stipulation and reference thereto, this ordinance was made a part of the contract

for the public work the assessment for which is contested in this action.

On March 10, 1910, the city passed another ordinance, No. A5016, providing:

"That hereafter all work done by common laborers for the city of Spokane or for any contractor, sub-contractor or other person doing work by contract or otherwise for the city of Spokane, shall receive the sum of three dollars ($3), per day for eight hours labor;"

and that the ordinance should be in force from and after April 1, 1910.

On March 25, 1910, the city council, by ordinance, provided for the improvement of Sixteenth avenue by constructing therein a sewer, to be paid for by special assessments against the property benefited, and created an assessment district. The contract for the work was thereafter let to one Broad, and when he had completed the work thereunder, an assessment roll was prepared and notice of the time and place for hearing objections was given. The appellant, an owner of property in the district, appeared and objected to the confirmation of the roll. His objections were overruled, and he appealed to the superior court. From an adverse decision of that court, he prosecutes this appeal.

The evidence showed that the contractor, in the performance of his contract, paid $2.75 a day for each common laborer employed in the work, as required by the ordinance first above mentioned and by his contract. The court refused to hear testimony as to whether he paid $3 a day, as required by the second ordinance above mentioned. The evidence showed that the prevailing wage for common laborers in the city of Spokane and vicinity, at the time of the performance of the contract in August, 1910, was $2.25 a day, whether for a ten-hour, nine-hour or an eight-hour day; and that, in March, when the improvement ordinance was passed, the prevailing wage was $1.85 for a ten, nine, or eight-hour day. There was no evidence whatever as to any distinction in pay by

reason of shorter hours, nor any evidence whatever that compensation for employment was ever computed by the hour. The contractor testified that 59 per cent of the cost of the work was paid out for common labor, and that, but for the ordinance, his bid would have been materially less.

The position taken by the appellant, as stated in the original opinion, and as adhered to in the briefs and argument on rehearing, is admirably summarized as follows:

"That the legislature may fix the hours of labor upon all public works and for public work even in cities is now well settled, and no allusion to sustaining authority will be made. Indeed, that feature of the case is not challenged by appellant; but it is contended that, where the city is acting merely as an agent of the property owner, it is bound to do its work to his best advantage, and cannot empirically fix a wage and compel its payment by an independent contractor. Appellant bases his argument on two propositions; (1) that the ordinance is unreasonable, contrary to public policy, and oppressive; (2) that the assessment is in contravention of the constitution of this state and of the constitution of the United States, in that it takes the property of this appellant without compensation and without due process of law. Abandoning legal phraseology, the concrete question, put in plain English is whether a city can improve the property of a citizen, either upon his petition or against his will, and tax an arbitrary sum therefor that puts the cost unreasonably above the cost of like work if done through the instrumentality of a private agency." *Malette v. Spokane*, 68 Wash. 578, 123 Pac. 1005.

The last sentence quoted seems to beg, rather than state, the real question. Of course, if the minimum wage is assumed to be unreasonably high, it would be indefensible on any theory, whether fixed by general statute or by ordinance, and whether paid out of a fund raised by general taxation or by special assessment. The real questions are: (1) Is it within the power of any legislative body, whether of the state or city, to fix a minimum wage for common labor as applied to public work paid for by special assessment? In other words, is such legislation void as in contravention of the

state and Federal constitutions in that it takes property without compensation and without due process of law? (2) Is the ordinance in question contrary to any public policy of the state, either expressed in, or implied from, state legislation? (3) Is the ordinance an unreasonable exercise of the right to prescribe the terms of contract by one of the parties, or is the amount prescribed an unreasonable wage? We will endeavor to discuss these questions, so far as may be, separately.

I. Is it within the legislative power, either of state or city, to prescribe a higher rate of wages than the prevailing rate as a minimum of wages to be paid for common labor in the doing of a public work to be paid for by special assessments against the property specially benefited thereby? The principal argument directed against such laws, when enacted by the state itself, is the claim that they necessarily increase the cost of the work. If, therefore, laws having exactly the same tendency have been upheld, such decisions furnish direct authority for upholding a frank and undisguised minimum wage law. As stated in the original opinion, it is now too well settled to require citation of authority that the legislature may fix the hours of labor upon all public work and for public work, even in cities. It is also true, as there stated, that "laws fixing the hours of labor and providing that no less than the *going* rate of wages shall be paid under contracts such as we have before us, have been generally upheld." To put the matter more exactly, we add that laws fixing the hours of labor have been generally upheld by the courts, even when coupled with the provision that the laborer shall receive for the shorter day prescribed a minimum of wages "not less than the current rate of per diem wages in the locality where the work is performed." Obviously this is a provision for pay *above* the "*going* rate of wages" for the same amount of time. *In re Dalton,* 61 Kan. 257, 59 Pac. 336, 47 L. R. A. 380; *State v. Atkin,* 64 Kan. 174, 67 Pac. 519, 97 Am. St. 343; *Atkin v. Kansas,* 191 U. S. 207; *Byars v. State,* 2 Okl. Cr. 481, 102 Pac. 804. As

said in *Atkin v. Kansas, supra*, quoting from *In re Ashby*, 60 Kan. 101, 55 Pac. 336:

"When the eight-hour law was passed the legislature had under consideration the general subject of the length of a day's labor for those engaged on public works at manual labor, without special reference to the purpose or occasion of their employment. The leading idea clearly was to limit the hours of toil of laborers, workmen, mechanics, and other persons in like employments, to eight hours, without reduction of compensation for the day's services."

The case so quoted by the United States supreme court, *In re Ashby*, is in itself a clear demonstration that the maximum hours law there under consideration had the necessary effect of fixing a minimum daily wage above the current rate for the same class of work. Moreover, it seems to have been overlooked in the former opinion in this case that the eight-hour law of this state, so far as overtime is concerned, expressly provides a minimum wage which would necessarily be above the going rate for the same amount of time. In Rem. & Bal. Code, § 6573 (P. C. 291 § 116), above quoted, it is provided that, in cases of emergency, the hours of work may be extended, "but in such case the rate of pay for time employed in excess of eight hours of each calendar day shall be one and one-half times the rate of pay allowed for the same amount of time during eight hours' service." A similar provision is found in the eight-hour law of Kansas, and it was for the violation of that provision, as well as the eight-hour provision, that the defendant in *Atkin v. Kansas* was convicted. See stipulated facts, 191 U. S. p. 210. The same provision is also found in an eight-hour law contained in a legislative charter of the city of Buffalo, and was upheld as constitutional and valid, and a contractor was held criminally liable for its violation. *People v. Warren*, 77 Hun 120, 28 N. Y. Supp. 303; *People ex rel. Warren v. Beck*, 10 Misc. Rep. 77, 30 N. Y. Supp. 473.

Assuming, as seems to be assumed, both in argument and in the original opinion in the case before us, that any mini-

mum of wages fixed above the current rate necessarily increases the cost of the work (a thing by no means certain), then it cannot be denied that a provision such as above quoted from the Kansas law would have precisely the same effect. If the one would increase the cost of the work, so, also, would the other, as a simple example will demonstrate. Assuming the current rate of per diem wages to be $2 for a ten-hour day, and assuming, also, a uniform efficiency in the work of a given laborer, then it follows that the minimum wage of $2 a day for, let us say, an eight-hour day, is just exactly forty cents more for the same work than it would cost but for the minimum wage provision. As another illustration, the evidence in the case before us shows that the observance of our own state eight-hour law alone would have had precisely the same effect on the contract here in question. The contractor himself testified in effect that, but for the minimum wage ordinance, the labor on this work would have cost him $2.25 a day for an eight-hour day, while the number of hours constituting a day's work customary at the time and place was ten hours. It is too plain for argument that every maximum-hours law prescribing less than the number of hours usually constituting a day's labor, when coupled with a provision for minimum pay not less than the current rate for a day's labor, is a minimum wage law, pure and simple, prescribing a wage above the current rate for the same class of labor. Every objection, therefore, which can be logically or legally raised against an undisguised minimum wage law can be advanced, just as logically and just as legally, against the usual eight-hour law. The appellant seems to recognize this fact, since he argues that there are only two grounds upon which courts have held valid laws limiting the hours of labor; that one applies to work hazardous to the health of the employees, as working in mines, mills and the like which, of course, rests upon the police power of the state (*Holden v. Hardy*, 169 U. S. 366), or where the employee is a child or woman, which also rests upon the same power

(*State v. Buchanan,* 29 Wash. 602, 70 Pac. 52, 92 Am. St. 930, 59 L. R. A. 342; *State v. Somerville,* 67 Wash. 638, 122 Pac. 324) ; and that the other exception is based upon the principle that, when the state or any of its municipalities performs public work, it then, as an employer, has the right to fix the terms upon which it will permit labor to be done for it. As examples of the last mentioned class of decisions, appellant cites *Atkin v. Kansas, supra; Curtice v. Schmidt,* 202 Mo. 703, 101 S. W. 61, and our own decisions, *In re Broad,* 36 Wash. 449, 78 Pac. 1004, 70 L. R. A. 1011, and *Gies v. Broad,* 41 Wash. 448, 83 Pac. 1025. It is true that the cases cited, and also the Oklahoma case, *Byars v. State, supra,* were based upon the latter ground, which is clearly and logically expressed in *Atkin v. Kansas, supra,* by the late Justice Harlan, speaking for the Federal supreme court, as follows:

"The improvement of the boulevard in question was a work of which the state, if it had deemed it proper to do so, could have taken immediate charge by its own agents; for it is one of the functions of government to provide public highways for the convenience and comfort of the people. Instead of undertaking that work directly, the state invested one of its governmental agencies with power to care for it. Whether done by the state directly, or by one of its instrumentalities, the work was of a public, not private, character.

"If, then, the work upon which the defendant employed Reese was of a public character, it necessarily follows that the statute in question, in its application to those undertaking work for, or on behalf of, a municipal corporation of the state, does not infringe the personal liberty of any one. It may be that the state, in enacting the statute, intended to give its sanction to the view held by many, that, all things considered, the general welfare of employes, mechanics and workmen, upon whom rest a portion of the burdens of government, will be subserved if labor performed for eight continuous hours was taken to be a full day's work; that the restriction of a day's work to that number of hours would promote morality, improve the physical and intellectual condition of laborers and workmen and enable them the better to

discharge the duties appertaining to citizenship. We have no occasion here to consider those questions, or to determine upon which side is the sounder reason; for, whatever may have been the motives controlling the enactment of the statute in question, we can imagine no possible ground to dispute the power of the state to declare that no one undertaking work *for it or for one of its municipal agencies,* should permit or require an employee on such work to labor in excess of eight hours each day, and to inflict punishment upon those who are embraced by such regulations and yet disregard them. It cannot be deemed a part of the liberty of any contractor that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state. On the contrary, it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern."

While, as shown by this quotation, the supreme court did not deem it necessary to place the decision on any other ground than the power of the state to prescribe the terms upon which contracts with it or its agent, the municipality, might be made, it is significant that it also suggests another ground; namely, the promotion of the "general welfare of employees, mechanics and workmen upon whom rests a portion of the burdens of government," and as tending to the production of better citizenship, thus unmistakably intimating that the act might also be soundly sustained as an exercise of the police power.

The appellant argues, and seems to have impressed the members of Department One of this court, save the late Chief Justice Dunbar, with the view that, though this court and other courts have held the eight-hour law sufficiently valid and constitutional to sustain a criminal prosecution, and though an exactly parallel ordinance to the one here in question was held by this court sufficiently valid to sustain an ac-

tion by a laborer for the collection of *a part of the minimum wage above the current rate for overtime,* which was withheld by the contractor (*Gies v. Broad,* 41 Wash. 448, 83 Pac. 1025), still those cases do not sustain, as constitutional, either the eight-hour law or the minimum-wage ordinance as applied to contracts for public work to be paid for by special assessment, or the minimum-wage ordinance as to any work; since, in the original opinion, it is said: "So far as we have been able to find, laws fixing a minimum of wages for unskilled labor have been uniformly condemned." The case of *Clark v. State,* 142 N. Y. 101, 36 N. E. 817, was not cited on the first hearing, and was hence excusably overlooked. In that case, a statute of the state of New York fixing minimum wages for day laborers on public works of the state was upheld by the court of last resort of that state, using the following language:

"It must be assumed that the legislature, and all other public bodies intrusted with the functions of government, general or local, will use the power conferred by the constitution or the law fairly, and in the public interests. There is no express or implied restriction to be found in the constitution upon the power of the legislature to fix and declare the rate of compensation to be paid for labor or services performed upon the public works of the state. That legislation is doubtless open to criticism from the standpoint of sound policy and expediency, but the courts have nothing to do with these questions, so long as it is not in conflict with the constitution; and we think that a general law regulating the compensation of laborers employed by the state, or by officers under its authority, which disturbs no vested right or contract, was within the power of the legislature to enact, whatever may be said as to its wisdom or policy."

We are persuaded that the view expressed in the original opinion that, in *Gies v. Broad, supra,* this court did not, in fact, hold the minimum wage ordinance of Spokane there involved constitutional, and the statement that "the sum of the court's holding" in that case was "that the contractor could not take a wage from a property owner and convert it, or any

part of it, to his own use," must be modified. As a matter of fact, that was one result of the holding in that case, but was far from its sum. As shown by the opinion itself, the court could not have held that, nor anything else touching the merits of the case, until it first decided that the ordinance was constitutional and valid. The amount involved was only $15.91, and the only thing which gave the court jurisdiction of the appeal for any purpose was the question of the constitutionality of the ordinance. As pointed out by the court:

"The appeal is brought within the jurisdiction of this court by reason of the fact that the action involves the validity of the ordinance above mentioned; the appellant contending that that part of the ordinance which fixes the minimum sum to be paid as wages for a day's labor on any public improvement undertaken by the city of Spokane, is unconstitutional and void." *Gies v. Broad*, 41 Wash. 448, 83 Pac. 1025.

The court then held that, under the rule announced in *Henry v. Thurston County*, 31 Wash. 638, 72 Pac. 488, no other question save that of the validity of the ordinance could be reviewed, adding, "If we find the ordinance valid, the inquiry is ended; if invalid, the judgment falls because founded on the ordinance." The following language used by Department One touching the opinion in *Gies v. Broad*, seems, therefore, hardly justified:

"In this opinion there is an expression which, although not necessary to the decision, may, if taken without qualification, seem to support the contention of the respondent. It follows:

" 'The principle involved in that case [*Atkin v. Kansas*, 191 U. S. 207] is not distinguishable from the principle involved in the case now before us. For, surely, if it be within the power of the state to limit the number of hours a laborer may be permitted to labor in one calendar day on any public work undertaken by it, it can fix the minimum sum that shall be paid him as wages for such labor. The power to do either must rest on the principle that 'it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities.' "

The language was not only "necessary to the decision," but must be "taken without qualification," since it decided the only question in the case of which this court had jurisdiction. The matter of estoppel as against the contractor to dispute a $15 debt could not give this court jurisdiction, in the absence of the constitutional question. Since no member of this court has yet expressed a readiness to frankly overrule the decision in *Gies v. Broad,* the conclusion seems irresistible that the ordinance here in question must be held valid.

But it is argued that *Gies v. Broad* and *Atkin v. Kansas,* and, by parity of reason, *State v. Atkin,* 64 Kan. 174, 67 Pac. 519, 97 Am. St. 343 (which was affirmed by the last mentioned case), and *Byars v. State,* 2 Okl. Cr. 481, 102 Pac. 804, do not determine the constitutional question because they did not arise at the instance of a taxpayer or of a protesting property owner. To the writer of this opinion, however, it seems hardly probable that the supreme courts of three states and the supreme court of the United States would have overlooked a phase of the question which, if counsel's contention be correct, must have made the decision of each of those courts different; since no court will be presumed to hold a man liable criminally, or even financially, for violating a void law. As pointed out in *In re Broad,* 36 Wash. 449, 78 Pac. 1004, 70 L. R. A. 1011, the unconscionable conduct of the contractor would not be a pertinent argument in such a case. As a matter of fact, the very contention now made appears to have been made in *State v. Atkin, supra,* which arose out of a contract for work paid for by special assessments. At any rate, the point was considered. The supreme court of Kansas said (see opinion 64 Kan. p. 175):

"The law which appellant violated must have its application in the light of the fact that municipal corporations are the creatures of the state. The legislature gives them being. They let contracts for the improvement of streets under

express authorization of the legislature, and cannot do so in the absence of such authority. In this instance the lawmaking power provided that the cost of the paving which the appellant was constructing should ·be paid by assessment against the abutting property. It might have provided a different method of payment, or withheld entirely from the city the right to improve its streets."

And again (see opinion 64 Kan. p. 179) :

"The fact that the abutting property-owners are charged more for the improvement by the application of the restrictive provisions of the law reducing the hours of labor may be admitted; yet if the work had been done by the state itself, which, as we have shown, has supreme authority in such matters, the property-owners could not complain that it employed and paid its servants conformably to the statute in question.

"There can be no distinguishing difference between the acts of the contractor in the employ of the county passed upon in the case of *In re Dalton, supra,* and those of the appellant here. Both were proceeding under contracts made with them by the agents of the state, and the principal had power to direct that eight hours should constitute a day's work for all persons laboring in its behalf."

With these facts and this holding before it, the supreme court of the United States affirmed the judgment of the supreme court of Kansas without reservation, on the ground that the work was of a public character, saying of the act, "indeed, its constitutionality is beyond all question." This, notwithstanding the fact that the contractor's conduct, as shown by the agreed facts (191 U. S. p. 210), was attempted to be excused by the fact that his contract with the laborer was for pay by the hour at the current hour rate, apparently in order to evade the minimum wage provision of the Kansas eight-hour law to which we have referred. Moreover, the brief for the plaintiff in error printed in the report of the case shows that the fact that the work was paid for by special assessments was called to the attention of the United States supreme court. It seems plain, therefore, when the actual

facts involved and the opinion of the Kansas court, affirmed by the supreme court of the United States, are considered, that it does sustain the decision in *Gies v. Broad, supra,* and that, when Department One of this court, in the first opinion in this case, reaffirmed allegiance to the doctrine laid down in *Atkin v. Kansas,* it was mistaken either in its view of the actual bearing of that case or in its reaffirmation of allegiance.

The case of *Byars v. State, supra,* a well-considered case, arose out of the violation of the Oklahoma eight-hour law, also in connection with a contract for public work to be paid for by special assessments against the property benefited, and the same contention was made against the constitutionality of the law as is made in this case. That the court acted advisedly and did not overlook that point is shown by the following language:

"Counsel for the defendant contend: That under the terms of this statute, under the guise of a police regulation when it is not so in fact, the right of the employer and employee to contract is abridged in such a manner as to be an infringement upon the constitutional rights of both parties. That said statute is invalid because it contravenes the fourteenth amendment to the Constitution of the United States, and that 'the contract for paving is not 'entered into by and on behalf of the city of Guthrie.' The city of Guthrie as a municipality is acting simply as an agent of the property owner, whose property abuts on the streets along the proposed improvement. While the city has supervisory power over the streets, the improvement as shown by the statement of facts is to be paid for solely by the property owners. Work of the kind mentioned therein does not come within the purview of the statute. Work in behalf of the city would be work for which the city was liable, and which was to be paid for by the city, and not abutting property owners.' We believe the contention of counsel for defendant is without merit, and is unsupported by reason or authority. We see in this law no infringement of constitutional rights." 2 Okl. Cr. 481, 102 Pac. 804.

The opinion discusses, approves, and follows the decision of the United States supreme court in the *Atkin* case, construes the Oklahoma statute as similar to that of Kansas, and closes as follows:

"The opening, construction and maintenance of public highways is purely a governmental function, whether done by the state directly or by one of its municipalities, for which the state is primarily responsible. And it is immaterial whether such public work is paid for by the state, the county, the city or by the benefited property owners. It is a work of a public, not private, character. The manner of payment does not change the character of the work."

In *Curtice v. Schmidt*, 202 Mo. 703, 101 S. W. 61, the supreme court of Missouri held valid an eight-hour labor ordinance of Kansas City, incorporated in a contract where the work was to be paid for by special assessment, and where the objection was raised by the property owner in contesting the assessment. The court expressly refused to base its holding upon the ground that such work was always done at so much an hour, but placed it on the ground that the ordinance was, in any event, constitutional, citing among others, the cases of *State v. Atkin, supra,* and *Atkin v. Kansas, supra.*

It is thus plain that there is ample authority to be found, both in state and Federal decisions, to sustain the power of the legislative body, either of the state or of the city, to prescribe a reasonable minimum of wages, even above the going rate for common labor performed on public work, and even when the work is to be paid for by special assessments against the property benefited thereby, and the courts have no power to pass upon the wisdom of the measure. We quote again from *Atkin v. Kansas*, 191 U. S. 207:

"No evils arising from such legislation could be more far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and upon grounds merely of justice or reason or wisdom annul statutes that had received the sanction of the

people's representatives. We are reminded by counsel that it is the solemn duty of the courts in cases before them to guard the constitutional rights of the citizen against merely arbitrary power. That is unquestionably true. But it is equally true—indeed, the public interests imperatively demand—that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the constitution. It cannot be affirmed of the statute of Kansas that it is plainly inconsistent with that instrument; indeed its constitutionality is beyond all question."

The true friends of constitutional government should be the last to counsel a departure from this rule, since its strict observance seems the only antidote for a growing sentiment in favor of pure parliamentary government. Since the question is one involving the Federal constitution, it would seem that the *Atkin* decision ought to have more weight than that of the supreme court of Indiana in *Street v. Varney Electrical Supply Co.*, 160 Ind. 338, 66 N. E. 895, 98 Am. St. 325, 61 L. R. A. 154, announced only a few months earlier than that in the *Atkin* case. The two cases present precisely the same constitutional questions, and the decision of the United States supreme court is diametrically opposed to that of the Indiana court, as quoted from at length in the former decision in this case.

The foregoing authorities make it clear that, if street improvement work paid for by special assessments is public work, performed under authority conferred by the sovereign power of the state, no constitutional guaranty is impaired by the ordinance in question. That such work is public work cannot be questioned. The power of the city to levy special assessments to pay for public work is referable solely to the sovereign power of taxation, delegated to it by the state under direction of the constitution, art. 7, § 9; Rem. & Bal. Code, § 7507, subdivs. 10 and 13 (P. C. 77 § 83) ; Hamilton on "Law of Special Assessments," § 47.

"It is axiomatic that private property may be taken for public use under the right of taxation, the power of police, or that of eminent domain. In the latter case, compensation must be made to the owner, while under the police power it is principally a matter of legislative discretion. Under the power of taxation for general governmental purposes, private property may in effect be confiscated, but under the power of special assessment, the limitation is the extent of the benefit conferred, as we shall see later. However, it is now settled in the Federal courts, and in the courts of last resort of practically every state of the Union which recognizes the power of special assessment, except Colorado, that all such assessments are laid under the taxing power." Hamilton, "Law of Special Assessments," § 49.

It is neither an exercise of the power of eminent domain nor of police power. Hamilton, Law of Special Assessments, §§ 39, 40, 44. We must not confuse the mode of payment for public work with the character of the work. We must not confound the mode of payment with an ownership or property interest in the subject-matter to which the work is applied. We must not confound the mode of taxation with the purpose of taxation. The work of improving a public street is public work and the street is a public street. The special tax is to pay for public work. The right to levy a special tax to pay for public work rests not in the citizen's property interest in the work itself, but only in the special benefit of the work to his property. The work is none the less public work, done by the city as an agency of the state, though done also in a quasi-corporate or administrative capacity as distinguished from its purely governmental functions. The property owner cannot be assessed beyond his benefit, no matter what elements enter into the cost of the work. The language above quoted from the supreme courts of Oklahoma and Kansas and from the United States supreme court thus becomes directly pertinent and determinative of the question here presented.

While cogent reasons might be advanced for sustaining legislation of this character as a proper exercise of the

police power of the state, delegated by our constitution to cities of the state, we find it unnecessary to place the decision on that ground or to discuss that question; since the state courts to which we have referred and the supreme court of the United States have sustained legislation which cannot be distinguished, either in principle or in effect, from the ordinance here in question, upon the simple ground that "it belongs to the state as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities." *Atkin v. Kansas, supra; Gies v. Broad, supra.*

II. It is contended that, even conceding the power of the state to adopt a minimum of wages to be paid to laborers on public works carried on through the agency of its municipalities, still the city has no such power. It is argued that the ordinance is void because it seeks to declare a matter of public policy, and it is asserted that neither this court nor the city council has any power to define a question of policy. As far as this court is concerned, the truth of the claim is so elementary that it may be passed with a simple admission. As to the power of the council, the question can hardly be so summarily dismissed. It is the clear intention of the constitution to give to cities of the first class, of which the city of Spokane is one, the largest measure of local self-government compatible with the general authority of the state. Constitution, art. 11, § 10. It can "make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws." Constitution, art. 11, § 11. By virtue of the general law, it has "all the powers which are now or may hereafter be conferred upon incorporated towns and cities by the laws of this state, and all such powers as are usually exercised by municipal corporations of like character and degree, whether the same shall be specifically enumerated in this act or not." Rem. & Bal. Code, § 7518 (P. C. 77 § 87). It can make "all regu-

lations necessary for the preservation of public morality,
health, peace, and good order within its limits." Rem. & Bal.
Code, § 7507, subd. 36 (P. C. 77 § 83). All of these powers
it assumed in its charter, adopted pursuant to the general law.
As to matters of local concern, wider powers than those con-
ferred upon cities of the first class by the constitution and
laws of this state can hardly be conceived. It seems plain,
therefore, that unless the ordinance in question is contrary
to some public policy of the state, either expressed by stat-
ute or implied therefrom, it must be held valid. It is not
claimed that it contravenes the policy of the state as declared
in any express statutory enactment; but it is urged that it
is contrary to public policy in that it increases the cost of
public work. As we have seen, the state eight-hour law con-
tains in itself a minimum-wage provision as to emergency
overtime which is in excess of the prevailing wage. Rem. &
Bal. Code, § 6572 (P. C. 291 § 115). Even exclusive of
this provision, it has the effect of a minimum wage law. The
prevailing daily wage in Spokane was shown to be the same
for an eight, a nine, or a ten-hour day. Hence, assuming
no increased efficiency by reason of fewer hours of work, the
state law would either increase the number of men simultane-
ously employed at the same rate of pay as for ten-hour days,
or would increase the number of days of employment for the
same number at the same rate. It follows that it tends to
increase the cost of work in exact proportion to the fewer
hours in the working day. The eight-hour law manifests a
public policy on the part of the state to better the condition
of laborers employed upon public work. The purpose of
the minimum wage ordinance is precisely the same, and the
policy which sustains the one warrants the other. We fail
to find wherein the ordinance in question is contrary to any
public policy of the state, either as declared or implied in
any statutory enactment. On the contrary, it is in accord
with the policy which underlies the eight-hour law.

8—77 WASH.

But it may be remarked, in passing, that it is by no means the general concensus of informed opinion that either maximum time or minimum-wage laws, not exceeding a reasonable living wage, when fairly tried out, will have the necessary effect of increasing the cost of work to any material extent, especially when applied only to public work. The evidence shows that there is no scarcity of laborers in Spokane, and it would seem that the shorter hours of labor and higher daily pay would necessarily attract many of them. The city and those doing its work by contract would thus have the choice, and could select the more efficient laborers. This would unquestionably tend to counteract in efficiency the added cost caused by shorter hours and higher pay. Contractors would, in time, learn this fact and make their calculations and bids accordingly. For a thoughtful discussion of this phase of the law, see an article in Atlantic Monthly for September, 1913, by James Bates Clark, Professor of Economics in Columbia University, by no means an appreciation; also, an article by Sidney Webb, in The Journal of Political Economy for December, 1912, page 979.

It is also asserted in the original opinion that, in its control and improvement of streets, "the city acts in its proprietary capacity," and that, where the work is paid for by special assessment, "its council is the agent of the property owner," the argument apparently being that the power of the council is limited by the strict rules of a private agency. It is true that the expressions to the effect of the first above quotation are found in many of the adjudicated cases, some of them our own, but these expressions are always stated in a qualified way. No well-considered case goes farther than to say that the city's power to improve streets is not a purely governmental function "in the strict sense." The cases usually related to the liability of the city for injuries by reason of defective streets, and the like, and the liability is the same whether the improvement of the streets was paid for out of the general fund or by special assessment against the prop-

erty benefited. *Sutton v. Snohomish*, 11 Wash. 24, 39 Pac. 273, 48 Am. St. 847. It is obvious that the mode of payment does not impress a character upon the work as public or private. No distinction has ever been made between the two classes of streets so far as their public character is concerned, or so far as the quality of the city's ownership is concerned. In neither is the city's ownership of that purely private quality which is found in its ownership of public utilities built and operated by it for hire or profit, such as water works or municipal lighting plants. It is only where the work is "of private advantage and emolument" to the corporation that the city "*quo ad hoc* is to be regarded as a private company" in the strict sense. *Bailey v. Mayor etc. of New York*, 3 Hill 531; 28 Cyc. 125. On the other hand,

"Public duties are, in general, those which are exercised by the state as a part of its sovereignty, for the benefit of the whole public, and the discharge of which is delegated or imposed by the state upon the municipal corporation. They are not exercised either by the state or the corporation for its own emolument or benefit, but for the benefit and protection of the entire population. Familiar examples of such governmental duties are the duty of preserving the peace, and the protection of property from wrong-doers, the construction of highways, the protection of health and the prevention of nuisances." *Hart v. Bridgeport*, 13 Blatchford, 289, 293.

These authorities are cited with apparent approval in *Seattle v. Stirrat*, 55 Wash. 560, 104 Pac. 834, 24 L. R. A. (N. S.) 1275. That case can, therefore, hardly be considered as authority for the claim that street work, however paid for, is not public work. It would seem that, as to the control and improvement of its streets, the functions of the city partake of both the governmental and corporate qualities; governmental, in that the power and duty to open and improve the highways rests primarily in the state as an attribute of sovereignty, and is delegated by it to the city as a governmental agency of the state; corporate, in that the streets of the city, in addition to being a matter of public concern to

the people of the whole state, like other highways, are also of more intimate concern to the corporate community as such. But the discussion of this phase of the question would seem to be largely academic, since, even if the work be considered purely a matter of private concern to the city, it, like any other person, can prescribe the terms upon which it will contract.

It is true, also, that it is sometimes stated that the city, in making improvement and levying special assessments to pay therefor, is the agent of the property owner.

"These statements are, however, mere dicta, representing an analogy but not a principle. The municipality is the superior imposing a tax, not an agent binding a principal by contract. Wherever the question becomes a practical one, it is held that the public corporation or quasi corporation is not the agent." 1 Page and Jones, Taxation by Assessment, § 16.

It is obvious that the agency is merely conventional and lacks nearly all of the elements of an ordinary agency. The authority does not emanate from the supposed principal. The work is not that of the supposed principal. He cannot discharge the supposed agent, nor direct the agent in the performance of the work. He pays for the work by an enforced, involuntary charge as he pays other taxes.

"While the general theory of assessments for benefits presents some points of resemblance to quasi-contract assessment is not a form of quasi-contract other than as taxes generally are." 1 Page and Jones, Taxation by Assessment, § 18.

It seems more exact to say that the council is the agent of the law, both in letting the contract and in levying the assessment. Hamilton, Law of Special Assessments, p. 400; 1 Page and Jones, Taxation by Assessment, § 19. As we have seen, the power to levy the special assessment is traceable solely to the taxing power of the state. In the absence of constitutional or statutory restraint, this power is subject to no other fundamental limitations than these:

"It must be for a public purpose, as taxation can be exercised for none other; the property upon which the charge is laid must be peculiarly and specially benefited by the work; and the charge must be apportioned according to the benefits by some reasonable rule, and must not exceed such benefits." Hamilton, Law of Special Assessments, § 54.

In the absence of some special provision that the work must be let to the lowest bidder, it would seem that the property owner whose property is assessed for a special improvement, *but only to the amount in which it is benefited* thereby, would have no more right to complain of the effect of a maximum-hours law or a minimum-wage law, as increasing the cost of the work, than would a general taxpayer where the work is to be paid for out of the general fund. Indeed, it would seem that he has less reason to complain, since, in theory at least, he gets a direct *quid pro quo* for the expenditure, while the general taxpayer does not. It will be noted that the quotation from Hamilton in the original opinion is guarded in this respect. We quote again the part stating the condition upon which such provisions have been held to invalidate the assessment:

"Where contracts for local improvements are required by law to be awarded to the responsible bidder offering to do the work for the lowest sum, any provision in the specifications tending to increase the cost and make the bids less favorable to the property owners is illegal and void. Such provisions are commonly restrictive of the hours of daily labor that men employed by the contractor may work, or forbidding the employment of Chinese or alien labor, or fixing the minimum rate of wages. Whatever form this restriction assumes will be disregarded by the courts, if the conditions increase the cost of the work to the taxpayers." Hamilton, Law of Special Assessments, § 542.

Obviously, if it is left to the discretion of the council to determine what elements of cost shall enter into the work, and whether the work shall be done by contract at all, or whether by the city itself and the cost assessed to the property benefited, and, if done by contract, there is no requirement that

it be let to the lowest bidder, then the rule stated by Hamilton would have no application.  So long as the council acted in good faith, a general law or a general ordinance not unreasonably increasing the cost of the work, would not invalidate the assessment.

But it is claimed that "the charter of the city of Spokane provides that contracts for work of the kind here undertaken shall be let upon competitive bids.  It is also the policy of the state, as declared by the legislature, that all contracts for local improvements shall be done by contract upon like bids." *Malette v. Spokane*, 68 Wash. 587.  As to the second statement above quoted, we have been cited to no statute of this state or legislative declaration of any kind requiring work by cities of the first class on local improvements such as here undertaken to be done by contract upon competitive bids, or directing that it must be done by contract at all; and diligent search has failed to reveal any such statute.  On the contrary the statutes, Rem. & Bal. Code, § 7507, subds. 10 and 13 (P. C. 77 § 83), declare:

"Any such city shall have power—

"10.  To provide for making local improvements, and to levy and collect special assessments on property benefited thereby, and for paying for the same or any portion thereof.

"13.  To determine what work shall be done or improvements made at the expense, in whole or in part, of the owners of the adjoining, contiguous, or proximate property, or others specially benefited thereby, and to provide for the manner of making and collecting assessments therefor;"

and that (Rem. & Bal. Code, § 7560):

"Any city of the first class having authority to provide for making local improvements and to levy and collect special assessments on property benefited thereby, and for paying for the same or any portion thereof; and to determine what work shall be done or improvements made at the expense, in whole or in part, of the owners of the adjoining, contiguous or proximate property, or others specially benefited thereby, and to provide for the manner of making and collecting assessments therefor, may exercise such authority by general or

special ordinance or by general and special ordinance jointly;"

and that (Rem. & Bal. Code, § 7567) :

"Cities of the first class shall by ordinance prescribe the
method by which this act shall be put into operation, and any
provisions herein which may be made applicable to existing
delinquent assessments may be extended by ordinance to
them."

See, also, the following sections of the statute: 5802, 7518,
7529, 7530, 7531, 7570, 7572, 7578, and 7894.  These statutory provisions all indicate a clear intention to leave the
whole matter of making such improvements in cities of the
first class to the discretion of the city, subject to its charter
provisions.  In the absence of some statute directing that the
work shall be done by contract, any city may do it either by
contract or through its own officers, and assess the cost
against the abutting property in proportion to the benefits.

"It was not essential that the town should let any contract
at all for doing the work.  We see no reason why it could not
have made the entire improvement through its own officers
and assessed the cost thereof on the property fronting upon
the streets in proportion to benefits.  We find nothing in the
statute which forbids it."  *Tumwater v. Pix*, 18 Wash. 153,
51 Pac. 353.

The right of a city to include in assessments items not fixed
by competition has been sustained by this court.  For example, interest in case of reassessment (*Northwestern & Pacific Hypotheek Bank v. Spokane*, 18 Wash. 456, 51 Pac.
1070; *Philadelphia Mortgage & Trust Co. v. New Whatcom*,
19 Wash. 225, 52 Pac. 1063; *Young v. Tacoma*, 31 Wash.
153, 71 Pac. 742) ; engineering expenses and the like (*In re
Jackson Street*, 62 Wash. 432, 113 Pac. 1112; *In re South
Shilshole Place*, 61 Wash. 246, 112 Pac. 228).  It would
seem that the discretion of the city, in so far as not controlled
by its charter, and, so long as it is exercised in good faith,
and not in such manner as unreasonably to increase the cost
of the work, will not be interfered with.

As to the second claim, we fail to find any provision in the charter of Spokane providing that such work must be done by contract. That matter is left to the discretion of the city council or board of public works, and when it is decided to do the work by contract, there is no provision that it shall be let to the lowest· bidder. The provisions applicable are as follows:

"Sec. 97. The board of public works shall have exclusive charge of the improvement and extension of all streets and alleys. They shall have charge of improving or altering all sewers. They shall have charge of the water works and all improvements and changes in the same. They shall have charge of laying all water pipes and doing everything that pertains to the conduct of the water works and the water supply system of the city. They shall also have charge of all things pertaining to the drainage of the city. They shall have charge of all bridges and the erection and improvement of the same. They shall have charge of the employing of all persons in discharge of the duties herein mentioned. They shall have charge of the erection and improvement of public buildings and the inspection of private buildings.

"Sec. 98. When it shall be decided to do work by contract, they shall advertise at least ten days in two daily newspapers of the city for bids, accompanied by a certified check to an amount to be fixed by the board and named in said advertisement, not exceeding 10 per cent of the estimated cost of the work, reserving the right to reject any and all bids; *provided,* that in all contracts awarded, in which the probable amount of expenditure would exceed $1,000, the publication shall be made for a period not less than twenty days. If the mayor and city council shall by resolution declare an emergency to exist, the publication herein provided for may be dispensed with.

"Sec. 99. The board shall have charge of all public works of every kind, where not otherwise provided for in this charter, and charge of furnishing all material and supplies for such work, and shall report to the city council such work, as it shall deem necessary and proper to be performed for the city, and if the council· shall concur with the board, the board shall have power to enter into contracts therefor and for the per- '

formance of such other public works, as may be authorized or directed by the city council.

"Whenever proposals for supplies for work shall be advertised to be let to the lowest bidder, a specified day and hour shall be named, when such bids shall be opened. Such bids shall be made in duplicate, one to be furnished to the mayor and one to the clerk of the city commissioners, and such bids shall be accompanied by an affidavit of the bidder, that the same is made in good faith, and there is no collusion or understanding between him and any other bidder on such work. Such bids may be handed in any time before the hour designated for opening the same; and all bids, original and duplicate, shall be opened at the hour named, in public and in the presence of such persons as may see fit to attend such opening of bids. As soon as the bids are opened, the clerk or other officer with whom the same are filed, shall, in the presence, of the board or officer opening them, record the same in a book kept for that purpose; *Provided*, nothing herein shall be construed to prevent the rejection of any or all bids tendered, when so deemed to be proper."

It will be noted that the board has the power to reject any and all bids, and that it is only in connection with proposals for supplies that the lowest bidder is mentioned at all. There is apparently a discretion, even in that case, as to whether the advertisement shall be for letting to the lowest bidder or not. These charter provisions are far from being of that mandatory character which would override the general statutes of the state or general ordinances of the city, applicable alike to all work whether done by contract or not. Since the work might be done without letting a contract at all, it is plain that the competitive principle would have no such drastic application as to prevent the city from providing reasonable conditions under which the work might be done, even though such conditions tended in some degree to modify competition in some particular.

III. Finally, it is urged that the ordinance is unreasonable, and, in its last analysis, the opinion on the first hearing rests upon the initial assumption that any minimum of wages materially above the prevailing rate is unreasonable *per se*.

With this we cannot agree. The reasonableness of an ordinance is always open to review by the court where it is passed under the general powers of the city and not in direct response to a statutory direction; but, even in such cases, the ordinance is entitled to a presumption of reasonableness until the contrary is made to appear to the court in some manner. Judge Dillon lays down the following rule:

"But the power of the court to declare an ordinance void because it is unreasonable is one which must be carefully exercised. When the ordinance is within the grant of power conferred upon the municipality, *the presumption is* that it is reasonable, unless its unreasonable character appears upon its face. But the courts will declare an ordinance to be void because unreasonable *upon a state of facts being shown* which makes it unreasonable. If the ordinance is not inherently unfair, unreasonable or oppressive, the person attacking it must assume the *burden of affirmatively showing* that as applied to him it is unreasonable, unfair and oppressive." 2 Dillon, Municipal Corporations (5th ed.), § 591.

The court, in such cases, will take notice of existing conditions and circumstances, and if it cannot say that the ordinance is, on its face, unreasonable in view of all of the conditions, it will not declare the ordinance void for that reason. 1 Dillon, Municipal Corporations (4th ed.), 327.

"Courts, in passing upon the reasonableness or unreasonableness of a statute, and deciding whether the legislature has exceeded its powers to such an extent as to render the act invalid, must look at the terms of the act itself, and bring to their assistance such scientific, economic, physical, and other pertinent facts as are common knowledge and of which they can take judicial notice." *State v. Somerville*, 67 Wash. 638, 122 Pac. 324.

See, also, *Miller v. State of Oregon*, 208 U. S. 412.

We will take notice of the fact that the cost of living, even as contributed to by the actual necessities of life, has greatly increased within the past few years, and that this increase has been out of proportion to the increase in the prevailing wages of common laborers. It is admitted that, if the ordi-

nance was reasonable, it is valid; but counsel insists that, as there exists no direct statutory enactment authorizing its passage, the ordinance must be shown to be "reasonable within the meaning of that term as applied to the judicial mind." It would be more exact to say that the burden is even then upon those attacking the ordinance to show that it is unreasonable. Aside from its recognition of constitutional and statutory inhibitions, the judicial mind is not different from any other mind. It must consider the circumstances, the purposes, and the reasonable tendency of the ordinance to meet such purposes. If the purpose is lawful, and the means reasonable, the ordinance cannot be declared invalid. The seventh biennial report of the commissioner of labor of this state, for 1909-10, presents a table bearing on the cost of living, which was cited at the second but not at the first hearing of this case. The commissioner, on pages 39 and 40, referring to this table, says:

"Prices for 1900 are given as a base and increases or decreases in the cost of the different commodities considered are shown for a period of years terminating with 1910. For the latter year, a final comparison is presented with prices quoted in 1900.

"An analysis of the tabulations supplies abundant evidence in support of the common conviction that the cost of living is advancing out of proportion to increases in compensation paid to wage earners. Moreover, it is important to note that in the list of commodities which have advanced most rapidly are included such staples as rye, graham and wheat flour, rice, eggs, lard, beans, ham, bacon and fresh meats, the average increase in cost of the above commodities for the period mentioned being 72 per cent."

The commissioner also states (biennial report for 1909-10, p. 6) that, from all of the assembled facts, and as a result of the investigations of the bureau, it is evident that wages have failed to keep pace with the advance in living expenses. This is also a matter of common knowledge. *There was no testimony to the contrary.* In view of these conditions, can any

one say that a wage of $2.75 a day, is, as a matter of law, more than a reasonable living wage? The unit, as applied to the problem of living, is the family, not the individual, and $2.75, or even $3 a day, can hardly be complacently pronounced as an unreasonable sum for supporting such a unit. (It may be remarked, in passing, however, that a comparison of the later with the earlier ordinance, which it does not repeal, indicates that it was probably never intended to apply to work done on the local improvement plan.) To hold that the payment of any sum which we cannot say is above a reasonable living wage, though it may be above the prevailing rate of wages, is a mere gratuity, would be to sacrifice the fact to a mere term. Such a holding would be an indictment of our civilization.

The judgment of the lower court is affirmed.

It is but fair to the members of Department One to say that the controlling questions in this case were much more thoroughly briefed and discussed on the rehearing than on the first presentation.

MAIN, MORRIS, and FULLERTON, JJ., concur.

PARKER, J. (concurring)—Upon more mature consideration, I am constrained to concur in the foregoing opinion, though it overrules the decision rendered by Department One, in which I concurred. I was led to entertain the views expressed in the former decision because it then seemed to me that there was a distinction to be drawn between work done by the city to be paid for out of its general funds, and work done under the supervision of the city officers to be paid for by special assessment against the benefited property; in that the former constituted an act of the city in its own behalf without any element of agency being involved, while the latter constituted an act of the city officers as agents of the property owners who were to pay for the improvement by special assessment against their property. However, a review of the authorities cited in Judge Ellis' opinion convinces me that no

such distinction can be rested upon sound legal grounds. The notion of agency on the part of municipal officers for the property owners in the making of local improvements, somewhat loosely expressed in the decisions of the courts, I apprehend, for the most part, arose from the fact that, in the early history of local improvements and assessments, they were not made save by consent of the property owners or some considerable majority of them; this, not for want of legislative power to provide otherwise, but because of legislative restrictions against forcing such improvements and assessments upon property owners except by consent of some specified majority of the owners of the property within the particular district involved. Under existing laws in this state, such improvements and assessments can be lawfully made even against the will of all of the property owners of the district involved. This being true, I am now of the opinion that the officers of the city, so far as their powers are concerned, do not represent the owners of property to be assessed for local improvements in any different capacity than they represent the general taxpayer when carrying on a public work for the city to be paid for by general taxation, and that the former is as purely public work as the latter.

The review of the statutory and charter powers of Spokane relative to the making of local improvements and assessments, made by Judge Ellis, seems to render it plain that such improvements are not required to be done by contract, nor to be awarded to the lowest bidder when done by contract, so far, at least, as labor is concerned; so that the element of competition in that regard is not, by law or charter, required in the making of such improvements any more than when the city employs a servant in any capacity. This problem, it seems to me, in its last analysis, is simply a question of the power of the city, through its duly constituted officers, to contract for public work involving the discretion of such officers to pay or cause to be paid reasonable compensation for such work. Viewed in this light, I am of the opinion that it was

not an abuse of discretion on the part of the city authorities to fix the minimum compensation of laborers employed upon public work of the city at the amount they did by the ordinance here involved.

At the former hearing, having in view a distinction between work done by the city at the expense of the general taxpayers and work done by the city officers at the expense of special assessment payers, and that the latter partook of the nature of private work between employer and employee, which I now concede to be erroneous, and the argument of counsel being then directed largely to the city's police power, I was convinced that the city possessed no such police power as would enable it to fix a minimum wage as between private employer and employee. Whether the state, by legislative enactment, may not fix a minimum wage as between private employer and employee, is quite a different question, as to which I refrain from expressing an opinion at this time. But I do not think the question of police power is involved in this case at all—no more than it is when the city employs a servant and fixes his compensation. Should the compensation so fixed be clearly excessive, a taxpayer may have the right to interfere by proper proceedings in court, just as he would have the right to so complain were the city buying supplies and paying a clearly excessive and unwarranted price therefor. I am not able to see that the property owner paying a local assessment would have any different or higher right to complain. I apprehend, however, that such unwarranted use of public funds by the city authorities would have to be of such a flagrant character that reasonable minds could not differ relative thereto before the courts could be induced to interfere. We have no such case here.

I am free to say that, upon the former hearing, I was as fully convinced of the correctness of the views expressed by the writer of the opinion as he was himself; but more mature consideration of the real question involved has led me to the

views I here express, and I therefore concur in the foregoing opinion.

CROW, C. J. (concurring)—I concur with Judge Parker. Although I signed the former opinion, I am now convinced that the judgment of the trial court should be affirmed.

GOSE, J. (dissenting)—I still adhere to the conclusion reached by the court at the first hearing. *Malette v. Spokane,* 68 Wash. 578, 123 Pac. 1005. The concrete question presented is, Can a city arbitrarily fix a minimum wage, approximately twenty-five per cent in excess of the current wage, and assess the same against the property benefited by the improvement upon which the labor has been performed, in the absence of express or clearly implied authority from the state? In my opinion it cannot do so.

"Courts will review the question as to reasonableness of ordinances passed under a grant of power general in its nature or under incidental or implied municipal powers, and if any given ordinance is found unreasonable will declare it void as a matter of law." McQuillin, Municipal Ordinances, § 182.

The power of the state itself to fix a minimum wage is not before us, for it has not as yet legislated upon that subject, nor has it expressly delegated the power to cities to do so. The needs of the laborer resulting from the higher cost of living are beside the question. Upon that subject, I raise no issue. The question is, Shall the reasonableness of the ordinance be measured by the current wage, or by what the court conceives the current wage ought to be? I think the former must be the test until the state itself has definitely spoken. Up to the present, it has never been held, to my knowledge, that a city may make a donation to a citizen under color of law, and assess the bounty against the property of an objecting owner. I cannot escape the conclusion that a payment for a public work, twenty-five per cent in excess of the price at which other citizens stand ready to do the work, where the

work is done by the city upon the assessment plan, is, in the absence of clear statutory warrant, in the nature of a bounty. If the city may fix a minimum wage largely in excess of the current wage, it may, with a like consistency, fix a minimum price for all material that enters into a public work, for the larger part of the cost of most material is human labor; and the man behind the brick and cement—that is, the man who furnishes the labor to put it into usable form—is as worthy of legislative protection as the man who puts it down. Whether the council is the agent of the property owner, as Judge Chadwick concluded, or the "agent of the law," as Judge Ellis concludes, where it acts under a general grant of power, its acts must be subjected to the test of reasonableness. Until the state has definitely declared a policy fixing a minimum wage upon all work done for it and its members, whether paid for by general taxation or by assessment upon the property benefited, I feel constrained to take the view that an ordinance like the one in question is unreasonable.

I have contented myself with a brief statement of my view because the subject was fully treated by Judge Chadwick following the first hearing. I therefore dissent.

Mount, J.—I concur in the view expressed by Judge Gose.

Chadwick, J. (dissenting)—I concur in what is said by Judge Gose. The result of the court's decision is, that a city council can, in order to meet what it conceives to be the living expenses of a citizen, arbitrarily take from the substance of one man and give it as a bounty to another, and that, without measuring or even considering the ability of the subject of its impressment to pay the tax.

The opinion of the court has taken a wide range, but it should be borne in mind that we did not in our former opinion hold the ordinance to be unconstitutional. We did not hold that the legislature might not, by general law, authorize a city to pass the ordinance in question. We

did not hold that a city could not, by charter amendment, provide for the payment of a minimum wage higher than, or even unreasonably higher than, the current or going wages. We did not hold that a city could not fix a wage scale to be paid its employees out of the general fund, or that it could not fix the hours of labor. Our holding was, in its essence, no more than this: that an agent is bound to do for his principal, when pursuing the trust relation, as well as he could have done for himself. Until the decision in this case was pronounced, this principle had been regarded as fundamental.

It may be inferred from what is said in the majority opinion that we held the ordinances of the city of Spokane fixing a minimum wage to be unconstitutional. In the former opinion, the constitutionality of the ordinances was not questioned. The judges who participated in that decision, with one exception, had no doubt that such ordinances, if properly passed, would do no violence to any constitutional guaranty of personal or property rights.

There is, and there can be, but one question for solution: that is, whether an ordinance, passed without the sanction of a general law passed by the legislature and approved by the governor, which fixes a wage from twenty-five to forty per cent higher than the current wages for like labor in the same place, can be taxed against an unwilling citizen without violating that fundamental principle of the law that municipal ordinances must be reasonable. We held, under the facts of the case before us, that the difference was so great that the ordinance was in its operation unreasonable. We did not hold or preclude ourselves from holding under a different state of facts, that the wages fixed by the ordinance might not be reasonable. The majority opinion seems to me to be an endeavor to meet a sociological problem with which this court can have nothing to do, for it is a legislative and political question, and the argument of the majority does not touch the premise of the question before us.

If approached at all, it is lost sight of in the assertion of these beneficent principles which are, at the present time, engaging the attention of thoughtful persons all over the world and which will in time be taken care of by appropriate legislation. In the absence of the authority to which Judge Gose has adverted, courts cannot, and should not, be influenced by the opinions of political propagandists, however engaging and however reasonable they may seem to be. Humanitarian impulses are the well-springs of social progress, but to define them and to put them into the forms of law is not the work of the courts. Their work is limited by narrower bounds, and wisely so; for people of this and all English speaking countries have undertaken, by express limitation and by the strongest implications, to keep the law making powers in the people themselves. The duty of a court is to follow the law as made by the people, and not to create a rule to meet a situation, however urgent; for the power to frame a humanitarian impulse into law (judge made) implies a power to frame a law that will usurp and cripple the rights of the people.

We have the law before us; Judge Gose has said, in his dissenting opinion, what it is: that is, that the power to do these things is in the legislature, and until it has spoken, it is the duty of the court to follow the law as it finds it. In this case, the court has followed a humanitarian impulse, and to that extent its action is to be applauded; but, in doing so, it has violated principles and commands that may invite those whose petitions should be more properly addressed to the law making powers to go to the courts and invoke the sympathy of the judges to the end that they will meet conditions not theretofore recognized by the people or by their representatives. This means but one thing, judicial legislation, which is judicial tyranny. This is especially so in this case. After the original decision was pronounced, the legislature convened in regular session. Bills were introduced in both the house and senate and an attempt was made to pass a law legalizing

that which this court had held to be invalid. The bills were killed. The idea of taking from one and giving to another found no favor with the legislature. This fact, coupled with the decision previously rendered, would in itself be sufficient under the hitherto accepted canons of statutory construction to warrant a reaffirmation of our previous decision. To hold otherwise makes this case *sui generis*.

I want to take exception to the concluding clause of the majority opinion:

"It is but fair to the members of Department One to say that the controlling questions in this case were much more thoroughly briefed and discussed on the rehearing than on the first presentation."

I deny that the real question before the court was more thoroughly briefed and discussed on the rehearing. Every question that was properly before the court was briefed and orally argued. The former opinion of the court was given the mature consideration of every member of the court, and was sanctioned by all, with two exceptions; one dissented, and the other was uncertain at the time. The briefs submitted on rehearing were longer. They quoted from the words and works of political economists and humanitarians, but they nowhere touched the law any closer than did the original briefs. In fact, they went beyond the law, and in some particulars, as it seems to me, are open to the criticism that they are coercive; or at least, an invitation to the court to subscribe to the political side of the controversy. In this sense, they were offensive and should have been stricken. Personally, I would be glad to see every man who labors paid a fair wage, more than a going wage, for I know that wages are too often hammered down to meet the bare necessities of the wage earner; but I have not the means to pay those who should be paid more, nor have I the right, when sitting in judgment on the affairs of my fellow men, to say that my neighbor shall pay more, and that by judicial mandate.

The humanitarian or economic phase of the question is

not properly before the court, as I have undertaken to demonstrate, but since it has been discussed, I have this to say: In considering the necessity of the man who works upon a paving job, it is possible that the court has overlooked the rights and necessities of the small home owner whose property is improved against his will and who is really unable to meet an arbitrarily added cost. He may be no less a laboring man than the man who works upon a street contract. The fact that a man works for a paving contractor has not, hitherto, either in law, equity, or morals, given him a right to be considered over the man who is working in some shop or factory, or in some store or printing office, and who is undertaking to build for himself and his family a comfortable home. To this man who labors, the rule of the majority may mean loss and confiscation. A question of ethics might arise if the court had looked at both sides of the question and had been willing to see the necessities, the struggles, of the wage earner who is also the small home owner, and who is, in virtue of a court made law, made to bear a burden he had no reason to expect, and which he must have assumed to be beyond the power of the court to declare.

By what right the majority assumes to disregard the testimony in this case, and upon the report of the commissioner of labor, say what a reasonable wage is, I am at a loss to know. Courts have hitherto based their conclusions upon testimony; but assuming that the court is right, I could, if it were proper to do so, furnish documents and opinions of equal merit and of equal force to sustain the proposition that the modern tendency of our municipalities to create assessment districts, to issue bonds, to put charges upon property, to buy prosperity on credit, must, in the end, inevitably force the one who now owns a home to give it up, and at the same time, deter the one who desires to put into realization the home instinct which is dominant in the heart of every normal man. Let it be remembered that, in compelling the home owner to pay from twenty-five to forty per cent more for

the workman the city furnishes him, than he would have to pay if he had employed the same man, and this to meet the increased cost of living, the money collected for that purpose comes in the main from those who are equally deserving and whose necessities are equally as great. The court has made the necessities of the one his fortune. It has made the trust of the other his misfortune.