[Civil No. 3657. Filed June 24, 1935.]

[46 Pac. (2d) 641.]

HIGHLAND PARK REALTY COMPANY, a Corporation, Appellant, v. CITY OF TUCSON, a Municipal Corporation, BRADLEY M. METCALF, Superintendent of Streets of the City of Tucson, and CHAS. C. IRVIN, City Treasurer of the City of Tucson, Appellees.

Messrs. Mathews & Bilby and Mr. T. K. Shoenhair, for Appellant.

Mr. B. G. Thompson, City Attorney, Messrs. Knapp, Boyle & Thompson and Mr. Edward P. Claine, for Appellees.

LOCKWOOD, C. J.—Highland Park Realty Company, a corporation, hereinafter called plaintiff, brought suit against the city of Tucson, a municipal corporation, Bradley R. Metcalf, as its superintendent of streets, and Chas. C. Irvin, as its treasurer, hereinafter called defendants, to have certain assessment liens and bonds declared invalid, and to enjoin defend-

ants from ever attempting to sell the lands of plaintiff under any of said liens. The facts set forth in the complaint were not denied by defendants, but a demurrer was filed which raised the questions of their sufficiency as a matter of law. The court sustained the demurrer, and plaintiff declining to amend the complaint, judgment was rendered in defendants' favor, and this appeal was taken.

The allegations of the complaint, briefly stated, are as follows: About the 5th day of September, 1933, the mayor and council of the city of Tucson passed and adopted a resolution declaring their intention to improve West Speedway between Stone Avenue and Tenth Avenue in said city, and determining that bonds be issued by the city of Tucson to represent the costs and expenses thereof. Thereafter, and on the 2d day of October, the mayor and council adopted a resolution ordering the work to be done, and there was published an invitation for sealed bids or proposals for the improvement. The bids received were thereafter opened, and a contract to perform the work awarded to the firm of White & Miller, who completed the improvement in accordance with the terms thereof. Thereafter the superintendent of streets levied assessments, according to law, against the various lots within the assessment district created by the resolution. Plaintiff owned a number of lots in this district, and there were assessed against them on account of the improvements aforesaid various sums amounting all told to nearly $2,000. Notice was given of a public hearing on the assessment to afford opportunity to all interested parties, but it is not claimed that plaintiff at any time did protest or object to the proceedings. Thereafter a resolution was passed approving the assessment and all previous proceedings had thereunder, and bonds were ordered issued to pay for the cost and expenses of the im-

provement remaining unpaid. They were thereafter prepared and delivered to the contractors, but for some unstated reason are now in the possession of the city of Tucson. All of the aforesaid proceedings were done in strict conformity with the provisions of the state law and charter and ordinances of the city governing street improvements of the nature involved, and the assessments aforesaid were therefore apparently valid and authorized liens of record against the lots of plaintiff in the district, and affected their title, salability and mortgagability.

The complaint then alleged that the liens and the bonds, aforesaid, were in truth invalid for the reason that the notice inviting bids for the construction of the improvements contained the provision that the bidder must conform to the provisions of chapters 12 and 71, Session Laws 1933, commonly known as the Minimum Wage Laws, and that contracts would not be awarded to any bidders who did not agree to comply therewith, and set up in detail the minimum wages which would be required under the contract. It was further alleged that the schedule of wages above referred to was made a part of the contract actually entered into, and that it was greatly in excess of the wages and rates of pay which the contractors would have been compelled to pay if not restricted by the provisions of the contract, so that all bidders, including White & Miller, were by reason thereof compelled to bid a much higher price for the work than they otherwise would have bid, which resulted in the improvement imposing a lien on plaintiff's lots for a far greater sum than otherwise would have been necessary.

It is plaintiff's contention that the Minimum Wage Laws are not applicable to special improvements made under the street improvement acts, and that the city had no legal authority to require that bids

and contracts under such improvement acts should comply with them.

There are two questions of law before us for consideration: 1. Did plaintiff, by its failure to protest against the proceedings aforesaid, in the manner provided in sections 520, 526 and 535, Revised Code 1928, acquiesce in and ratify them? 2. Do the provisions of chapters 12 and 71, *supra,* apply to improvements made under the various street improvement acts, which are to be paid for by means of special assessments levied against the lands benefited?

This action, while in form applying only to the bonds for one particular street improvement district, was stated by counsel to be brought, in reality, for the purpose of determining the question of whether the Minimum Wage Laws apply to other subsequently contemplated street improvements. It is thus, in character, very similar to the numerous bond validation cases which we have had before us, and to which we referred in *Maricopa County Municipal Water Conservation District No. 1* v. *La Prade,* 45 Ariz. 61, 40 Pac. (2d) 94. But unlike the large majority of suits of this class, in which both parties are anxious that the same result be reached by the court, and in which, either inadvertently or otherwise, only one side of the case is really fairly briefed and presented to us, counsel in the present case have obviously spent considerable time and effort in an attempt honestly and ingenuously to assist the court in determining properly all the questions which could arise in a suit of this nature. We commend their conduct in this behalf most highly, and urge it as a model to be followed by other counsel in subsequent proceedings of this nature.

So far as the right of the state to establish a Minimum Wage Law for labor on public works for itself or its political subdivisions is concerned, the

law for Arizona has been determined by the cases of *State* v. *Jay J. Garfield Bldg. Co.,* 39 Ariz. 45, 3 Pac. (2d) 983, and *State* v. *Anklam,* 43 Ariz. 362, 31 Pac. (2d) 888. We have also in the case of *State* v. *Jaastad,* 43 Ariz. 458, 32 Pac. (2d) 799, held that chapters 12 and 71, *supra,* apply not only to public work done directly for the state and its general political subdivisions, but also to municipal corporations organized under sections 2 and 3, article 13, of the Constitution, and commonly known as "Home Rule Cities." It is therefore not necessary to consider or discuss the general rule in other jurisdictions in regard to the constitutionality of Minimum Wage Laws applying to public work, direct or indirect. The only point which is open for consideration is whether, within the meaning of chapters 12 and 71, *supra,* work of the character involved herein is "public work." Upon examining the authorities, we find two lines of decisions. The first, cited to us by plaintiff, adopt the theory, in substance, that street improvements of the character in question are not public works, within the meaning of Minimum Wage Laws, but that they constitute work performed in reality for the benefit of and therefore by the owners of the land in the special improvement district benefited thereby, and that the municipality or state, in all the proceedings in regard to the work, is not acting for the public generally, but merely as an agent for the owners. *Meyer* v. *Ring,* 162 Ark. 9, 257 S. W. 388; *Fitzgerald* v. *Walker,* 55 Ark. 148, 17 S. W. 702; *Winter* v. *Winter,* 95 Neb. 335, 145 N. W. 709, 50 L. R. A. (N. S.) 697; *Street* v. *Varney Electrical Sup. Co.,* 160 Ind. 338, 66 N. E. 895, 98 Am. St. Rep. 325, 61 L. R. A. 154; *Wilson* v. *City of Atlanta,* 164 Ga. 560, 139 S. E. 148; *Genilla* v. *Hanley,* 6 Cal. App. 614, 92 Pac. 752; *Barber Asphalt Paving Co.* v. *Bancroft,* 167 Cal. 185, 138 Pac. 742; *Flinn* v. *Peters,* 3 Cal. App. 235, 84

Pac. 995; *Bohn* v. *Salt Lake City,* 79 Utah 121, 8 Pac. (2d) 591, 81 A. L. R. 215.

The other cases hold that work of this character is public work, performed under the authority of the state or municipality for the benefit of the public in general, and the fact that the adjoining property is incidentally benefited more than other property thereby, and therefore made liable for the cost of the work, has nothing to do with the essential character thereof. *Malette* v. *City of Spokane,* 77 Wash. 205, 137 Pac. 496, Ann. Cas. 1915D 225, 51 L. R. A. (N. S.) 686; *Byars* v. *State,* 2 Okl. Cr. 481, 102 Pac. 804, 812, Ann. Cas. 1912A 765; *Curtice* v. *Schmidt,* 202 Mo. 703, 101 S. W. 61, 10 Ann. Cas. 702. The reasoning in *Wagner* v. *City of Milwaukee,* 177 Wis. 410, 188 N. W. 487, and *Metropolitan Water Dist.* v. *Whitsett,* 215 Cal. 400, 10 Pac. (2d) 751, also tends to support the second rule, though the cases last cited do not involve street improvements by special assessments.

Were we therefore to consider only the number of authorities, we should be bound to hold that chapters 12 and 71, *supra,* do not apply to work done under the Street Improvement Acts of 1928 (Rev. Code 1928, § 511 et seq.). We think, however, that, on examining the cases which support the first rule, they will fall into two classes: (a) The older ones, which are generally obviously based on the theory that Minimum Wage Laws of any nature are unconstitutional as being an interference with the sacred (?) right of contract so speciously fair in theory and so often manifestly unjust in practice, monopolistic in character, and, generally speaking, obnoxious to the principles of rugged individualism, so long emphasized by many of our courts. As far as these cases are concerned, they are so much at variance with the general political and economic theories of public pol-

icy found in our Constitution, statutes and decisions that they are clearly inapplicable.

The second group of cases apparently recognize that Minimum Wage Laws may properly be adopted when the work involved is wholly public in its nature and done directly under the authority of the state, or one of its political subdivisions, and compensation to the employee comes from the general tax funds, but insist that work paid for by assessments to adjoining property is really private in its nature, the municipality coming into the picture only as the agent of the property owner, and then apply the well-known rule that an agent must act for the benefit of his principal at all times and may not, in purchasing goods or labor, pay more than the lowest price at which he can secure a product of the kind his principal desires. Whatever may be the rule in the states which uphold this doctrine, we think on reason and logic it is unsound, and should not be adopted in Arizona. Probably the leading case on the right of states to adopt a Minimum Wage Law is that of *Atkin* v. *State of Kansas,* 191 U. S. 207, 24 Sup. Ct. 124, 126, 48 L. Ed. 148. Therein the court, speaking through Justice HARLAN, said:

"These questions—indeed, the entire argument of defendant's counsel—seem to attach too little consequence to the relation existing between a state and its municipal corporations. Such corporations are the creatures — mere political subdivisions — of the state, for the purpose of exercising a part of its powers. They may exert only such powers as are expressly granted to them, or such as may be necessarily implied from those granted. What they lawfully do of a public character is done under the sanction of the state. They are, in every essential sense, only auxiliaries of the state for the purposes of local government. They may be created, or, having been created, their powers may be restricted or enlarged or altogether withdrawn at the will of the legisla-

ture; the authority of the legislature, when restricting or withdrawing such powers, being subject only to the fundamental condition that the collective and individual rights of the people of the municipality shall not thereby be destroyed. . . .

"The improvement of the boulevard in question was a work of which the state, if it had deemed it proper to do so, could have taken immediate charge by its own agents; *for it is one of the functions of government to provide public highways for the convenience and comfort of the people.* [Italics ours.] Instead of undertaking that work directly, the state invested one of its governmental agencies with power to care for it. Whether done by the state directly or by one of its instrumentalities, the work was of a public, not private character.

"If then, the work upon which the defendant employed Reese was of a public character, it necessarily follows that the statute in question, in its application to those undertaking work for or on behalf of a municipal corporation of the state, does not infringe the personal liberty of any one. It may be that the state, in enacting the statute, intended to give its sanction to the view held by many, that, all things considered, the general welfare of employees, mechanics, and workmen, upon whom rest a portion of the burdens of government, will be subserved if labor performed for eight continuous hours was taken to be a full day's work; that the restriction of a day's work to that number of hours would promote morality, improve the physical and intellectual condition of laborers and workmen, and enable them the better to discharge the duties appertaining to citizenship. We have no occasion here to consider these questions, or to determine upon which side is the sounder reason; for whatever may have been the motives controlling the enactment of the statute in question, we can imagine no possible ground to dispute the power of the state to declare that no one undertaking work *for it or for one of its municipal agencies* should permit or require an employee on such work to labor in excess of eight hours each day, and to inflict punishment upon those who are embraced by such regula-

tions and yet disregard them. It cannot be deemed a part of the liberty of any contractor that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state. On the contrary, it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern.''

In that case, as in the one at bar, a municipality had contracted with a private person to construct a pavement on one of the city streets, and the question arose as to whether the contractor was bound to pay the wages fixed by the statute.

In the case of *Byars* v. *State, supra,* in discussing the theory of agency, the court said:

'' . . . The Constitution of Oklahoma expressly reserves to the state control over all public highways, including the roads, streets, and alleys of its municipalities. The opening, construction and maintenance of public highways is purely a governmental function, whether done by the state directly or by one of its municipalities, for which the state is primarily responsible. And it is immaterial whether such public work is paid for by the state, the county, the city, or by the benefited property owners. It is a work of a public, not private character. The manner of payment does not change the character of work.''

In the state of Washington, the court had before it the precise question involved herein in the case of *Malette* v. *City of Spokane,* 68 Wash. 578, 123 Pac. 1005, Ann. Cas. 1913E 986. It took the view adopted by plaintiff herein in a decision by Department 1 of the court. The matter came up on a motion for rehearing before the entire court sitting *en banc,* and

the court, by a majority of six to three, reversed its previous decision. *Malette* v. *City of Spokane*, 77 Wash. 205, 137 Pac. 496, 503, Ann. Cas. 1915D 225, 51 L. R. A. (N. S.) 686. Justice ELLIS discusses the question most thoroughly and reviews practically every case at that time decided and bearing in any manner upon the question, and, after a thorough consideration of the cases, says:

" . . . We must not confuse the mode of payment for public work with the character of the work. We must not confound the mode of payment with an ownership or property interest in the subject-matter to which the work is applied. We must not confound the mode of taxation with the purpose of taxation. The work of improving a public street is public work and the street is a public street. The special tax is to pay for public work. The right to levy a special tax to pay for public work rests not in the citizen's property interest in the work itself, but only in the special benefit of the work to his property. The work is none the less public work done by the city as an agency of the state, though done also in a *quasi* corporate or administrative capacity, as distinguished from its purely governmental functions. The property owner cannot be assessed beyond his benefit, no matter what elements enter into the cost of the work. . . . "

We are of the opinion that upon reasoning in accord with the general public policy of our state, work of the nature involved in the present action is "public work," whether done directly by the state or through a third party under contract with the state or any of its political subdivisions, and that public authorities in their actions and proceedings of this nature are representatives, not of the private property owners, but of the state.

For the foregoing reasons, we hold that chapters 12 and 71, *supra,* apply to work done in the improvement of streets by contract, as well as by direct labor

on behalf of the public, whether it is paid for by special assessments against the adjoining property or from the general public funds.

In view of what we have just said, we need not consider whether plaintiff, by its failure to protest against the proceedings involved herein, waived its right to object thereto.

The judgment of the superior court of Pima county. is affirmed.

McALISTER and ROSS, JJ., concur.