809 P.2d 961

**ACHEN–GARDNER, INC., an Arizona corporation, Petitioner,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, the Honorable David L. Roberts, a Judge thereof, Respondent Judge,**

**CITY OF CHANDLER, a municipal corporation; and Jeri–Co Group, Inc., an Arizona corporation, Real Parties in Interest.**

**No. 1 CA–SA 90–089.**

Court of Appeals of Arizona, Division 1, Department C.

Aug. 14, 1990.

Review Granted May 7, 1991.

Morrison, Hecker, Curtis, Kuder & Parrish by Mark A. Nadeau and David L. Abney, Phoenix, for petitioner.

Dennis M. O'Neill, Asst. City Atty., Chandler, for real party in interest City of Chandler.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Jeffrey B. Smith, Phoenix, for real party in interest Jeri-Co Group, Inc.

Snell & Wilmer by Jarril F. Kaplan, James R. Condo, E. Jeffrey Walsh, Nancy A. Stratta, Phoenix, for amicus curiae Associated General Contractors of America—Arizona Building Chapter.

Shelley & Bether by J. Lamar Shelley, Mesa, for amicus curiae League of Arizona Cities and Towns.

## OPINION

TAYLOR, Presiding Judge.

Achen-Gardner, Inc., (Achen-Gardner) brought this special action against the Superior Court, in and for Maricopa County, and real parties in interest the City of Chandler (Chandler) and Jeri-Co Group, Inc. (Jeri-Co). Achen-Gardner asks this court to consider whether the public street improvement project undertaken by Chandler and Jeri-Co, through a development agreement under the provisions of A.R.S. § 9–500.05, is subject to Arizona's competitive bidding statutes, A.R.S. §§ 34–201 to –226. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, A.R.S. § 12–2101 B, and Rule 8, Arizona Rules of Procedure for Special Actions. *See Big D Constr. Corp. v. Court of Appeals*, 163 Ariz. 560, 789 P.2d 1061 (1990). On July 13, 1990, we entered our order to the Superior Court to comply with the directives set forth in our conclusion in this opinion.

## I. FACTS AND PROCEDURAL HISTORY

In 1988, the Arizona Legislature enacted A.R.S. § 9–500.05, which provides in pertinent part as follows:

A. A municipality, by resolution or ordinance, may enter into development agreements relating to property in the municipality....

.    .    .    .    .

F. In this section, unless the context otherwise requires:

1. "Development agreement" means an agreement between a municipality and ... a landowner or any other person having an interest in real property that may specify or otherwise relate to any of the following:

.    .    .    .    .

(g) Conditions, terms, restrictions and requirements for public infrastructure and the financing of public infrastructure and subsequent reimbursements over time.

The purpose of this legislation is to permit the expeditious construction of needed or desired public improvements in order to facilitate a proposed private development. The initial capital outlay for the costs of the public improvements is provided by the

developer who is assured of reimbursement by the municipality pursuant to an agreed upon repayment schedule. This procedure permits the developer to have the public improvements ready for use when the development is opened to the public; permits the municipality to avoid the risk of performing improvements for a project that might not materialize; and further permits it to factor repayment into the municipal budget over a period of time, and upon such contingencies as the parties may specify.

In June 1989, Chandler entered into a development agreement pursuant to A.R.S. § 9-500.05 with D.W.C. Commercial Properties (D.W.C.) to develop the Sun-Tech Center, a retail commercial development located on the northeast corner of Alma School and Warner Roads. The agreement required the developer to modify certain existing public streets as off-site improvements necessary for the private development of the site. In return, Chandler was to reimburse the developer for the full cost of these off-site improvements from a portion of the sales taxes collected from the development's retail tenants. The agreement also provided that "Developer awards contract to lowest reasonable bidder; if for some reason Developer rejects bid, then Developer pays the difference between lowest bid and bid selected." This agreement was recorded in the Maricopa County recorder's office on June 15, 1989. D.W.C. subsequently assigned its rights and obligations under the development agreement to Jeri-Co.

In November 1989, Achen-Gardner received the "Notice of Call for Bids" for the Sun-Tech Center's off-site improvements on Chandler city letterhead, designating Chandler and Jeri-Co/Walmart Stores, Inc., as "Joint Developers." Interested contractors were invited to submit bids to the Chandler purchasing office, where a pre-bid conference was also held, at which Chandler officials described the development agreement and informed bidders that

Jeri-Co, not Chandler, would award the street improvement contract.

Achen-Gardner submitted a timely bid proposal ($394,553.87) and bid bond to Chandler officials. On December 18, 1989, after publicly opening the bids, Chandler officials announced that Achen-Gardner was the lowest bidder by almost $31,000. On December 21, the Chandler city engineer sent a letter to Jeri-Co recommending that they award the project contract to Achen-Gardner as the lowest bidder, and stated that Chandler would reimburse Jeri-Co only up to the $394,553.87 amount.

Early in January 1990, Achen-Gardner contacted Jeri-Co and identified itself as the low bidder and requested a meeting to discuss the street project. Jeri-Co informed Achen-Gardner that the decision to award the contract had not been made. Achen-Gardner later learned that Jeri-Co would not award it the contract and instead would perform the street improvements themselves, even though Jeri-Co had not submitted a bid.[1]

Achen-Gardner then requested Chandler's help in awarding the contract, but a representative of Chandler told Achen-Gardner that, under the development agreement, Chandler was powerless to award the contract. Achen-Gardner thereafter met with the Chandler city attorney, who told Achen-Gardner that the Chandler city council would recommend to Jeri-Co that it award the street improvement contract to Achen-Gardner. Jeri-Co, however, refused. Consequently on February 1, 1990, counsel for Achen-Gardner sent a demand letter to Chandler's mayor and city attorney, Jeri-Co, and D.W.C., demanding that Chandler and Jeri-Co award the contract to Achen-Gardner immediately. Jeri-Co again refused.

On April 6, 1990, Achen-Gardner filed a special action in superior court, claiming that Chandler's development agreement violated Arizona's competitive bidding laws, and seeking an order (1) enjoining the actions of Chandler and Jeri-Co, and (2) awarding the street improvement contract

---

1. The record from the court below indicates that Jeri-Co did not possess the proper license to do the street improvements, and consequently, could not have submitted a bid.

to Achen–Gardner. After a hearing, respondent trial judge granted Chandler's and Jeri–Co's motions for directed verdict and denied Achen–Gardner's requested relief, concluding that Achen–Gardner had constructive notice that Jeri–Co and not Chandler would award the contract, that ... "No reason has been shown as to why the developer must comply with the competitive bidding statutes in awarding the contract," and that ... "The City and the public are protected by the bidding procedures used because reimbursement is limited to the amount of the low bid." Achen–Gardner filed a petition for special action, asking, *inter alia*, that this court review whether development agreements pursuant to A.R.S. § 9–500.05 are subject to Title 34, Arizona's competitive bidding statutes. Subsequently, we granted leave to the Arizona League of Cities and Towns to appear and file a brief as *amicus curiae*, urging this court to find that public street improvements are not "structures" and, therefore, are not subject to competitive bidding statutes. We also allowed the Associated General Contractors of America— Arizona Building Chapter to appear and file a brief as *amicus curiae*, urging this court to hold (1) that all public work projects are subject to Arizona's bidding laws; and (2) that development agreements pursuant to A.R.S. § 9–500.05 are not exempt from the restrictions imposed by Title 34.

Because this case is one of first impression in Arizona and has state-wide impact, we granted special action jurisdiction. Our conclusions lead us to grant the relief requested.

## II. STREET IMPROVEMENTS AS STRUCTURES

■ The first issue we address is whether this public street improvement is a "structure, addition or alteration" under A.R.S. § 34–201 and, therefore, subject to competitive bidding statutes.

According to the record before us, this off-site street improvement project calls for reconfiguring Warner, Mariposa, and Alma School Roads, installing traffic signals and signs, and restoring the landscaping. The work contemplated is precise and detailed. The plans and specifications require the contractor to cut and remove 2,381 square yards of pavement, 2,134 linear feet of curbs and gutters, and 8,642 square feet of sidewalks, along with existing storm drains, basins, and drain pipes. Fire hydrants and electronic traffic signals with 2,455 linear feet of conduit must be relocated. After the existing roadways are realigned, the project requires constructing 2,302 linear feet of integral concrete curb and gutter, 13,558 square feet of concrete sidewalk with ramps, 4,100 square feet of curb return, and new curb openings for spillways. The contractor must then regrade 4,189 square yards of roadway area enclosed by these improvements, and pave it with layers of ABC material and asphalt. The plan also requires construction of 1,844 linear feet of concrete median curbing and median landscaping.

Contracts for public improvements and the applicability of competitive bidding to public works are governed by Title 34 of the Arizona Revised Statutes. The Arizona legislature enacted the predecessor of Title 34 in 1919 under the title "Regulating the Employment of Architects and the Letting of Contracts for the Construction or Alteration of or Additions to Public Buildings, and Repealing all Acts in Conflict Herewith." 1919 Ariz.Sess.Laws ch. 51. This Act was not merely concerned with public buildings, but rather public building projects requiring the design and preparation of plans by professional architects and contractors. *See id.* at §§ 1–3, 5–6, 9. In 1974, the legislature broadened the Act, the modern Title 34, to read "Relating to Public Buildings and Improvements." 1974 Ariz.Sess.Laws ch. 179. The legislature expanded Title 34 to include projects other than just buildings, and maintained the importance of requiring public bidding when such projects would entail professional expertise.

■ We must ascertain the meaning of "structures" in Title 34 for the purpose of determining whether the street improvements at issue fall within the statutory

requirement.[2] The substantive provisions of Title 34 indicate that the legislature contemplated more than just buildings. Arizona Revised Statutes § 34–201(C) includes "any building, *structure, addition* or *alteration*" (emphasis added), and § 34–201(B) includes "any *construction,* building, *addition* or *alteration*" (emphasis added). Further, § 34–222 specifies bond requirements for a "public building" and a "public work or improvement."

Two Arizona cases support applying Title 34 to this public street project. In *Secrist v. Diedrich,* 6 Ariz.App. 102, 106, 430 P.2d 448, 452 (1967), this court implicitly held that landscaping fell under the provisions of §§ 34–201 to –226.

> In passing the subject competitive bidding statute, we believe the legislature was intending to affect all contracts for the construction of buildings and structures, or alterations thereto, which are of such substance as to require working drawings and specifications ... and that *it would be a circumvention of this intent to permit construction of this type to be performed without competitive bidding*....
> We do not pass upon whether the "landscaping" work here performed constitutes the construction of a ... "building or structure, or additions to or alterations of existing buildings or structures" ... so as to come within the purview of the subject statutory provisions. Both in the lower court and in the briefs filed in this court *it has been assumed that this [landscaping] does fall within [§ 34–201], and we leave the record as we find it.*

*Id.* at 106–07, 452 P.2d at 452–53 (emphasis added). The case at bar involves improvements of public streets, sidewalks, curbs, gutters and traffic signals—substantially more than landscaping. Similarly, in *City of Phoenix v. Wittman Contract, Co.,* 20 Ariz.App. 1, 5, 509 P.2d 1038, 1042 (1973), this court also implicitly determined a water line to be a "structure" when we applied the bidding statutes to its construction.

Although buildings are always structures, a structure is not always a building. 83 C.J.S. *Structure* (1953). The use of both "structure" and "building" in Title 34 suggests the legislature intended that the word "structure" mean something other than "building." *See, e.g., Continental Bank v. Arizona Dept. of Revenue,* 131 Ariz. 6, 8, 638 P.2d 228, 230 (App.1981) (statutes should be interpreted so that no word is rendered superfluous, void, or insignificant).

Chandler and Jeri–Co argue that Title 34 only pertains to public "buildings," and that structures are buildings. They claim that public street improvements are not "structures" within Arizona's bidding laws. We disagree. To accept these arguments would require this court to narrow the legislative application of Title 34 and to ignore the intricate detail and complexity of Chandler's street improvement project. When the legislature originally enacted the bid statute in 1919, Arizona street improvements were substantially different than they are today. To construct or improve a street in 1919 probably involved hitching mules or horses to a scraper or other such grading equipment and clearing and leveling a path in the dirt and rock. Achen–Gardner does not contend, and neither do we, that such roads constituted "structures."[3]

However, the street improvements at issue are technical in design and construction. Licensed engineers are required to prepare detailed plans and specifications for use by licensed general contractors. Consideration must be given to weight-bearing capabilities, temperature and moisture tolerance, friction characteristics and

---

2. Because "structures" is not defined by the Act, to protect the public interest requires a liberal interpretation. *See Rollo v. City of Tempe,* 120 Ariz. 473, 474, 586 P.2d 1285, 1286 (1978); A.R.S. § 1–211(B).

3. Illinois has also distinguished between dirt roads and paved roads and held that while dirt roads are not "structures," paved roads are. *See Village of Niles Center v. Industrial Comm'n,* 371 Ill. 622, 21 N.E.2d 745 (1939); *City of Rock Island v. Industrial Comm'n,* 287 Ill. 76, 122 N.E. 82 (1919).

skid resistance, drainage, and a host of other highly technical factors. The complex mixture of materials involved in constructing a modern paved street, the grading plans, and the precision of construction design and performance, bring the modern street within the meaning of the term "structure." The West Virginia Supreme Court considered the construction of the modern street in *State v. Royal Indemnity Co.:*

> In its widest sense, any production or piece of work artificially built up, or composed of parts joined together in some definite manner, is a structure. Thus we find that the term structure, when applied to material things made by human labor ... means something composed of parts and portions which have been put together by human exertion. It would seem plain that a section of the improved public highway, when ready for its useful purpose of travel, is a structure in a literal sense, composed of concrete, rock, sand, and earth, fashioned into a symmetrical whole....

99 W.Va. 277, 287, 128 S.E. 439, 443 (1925) (citations omitted).

The record from the proceedings below reflects that customary industry practice is to competitively bid public street construction projects pursuant to Title 34. Because the construction of these streets is a highly technical public improvement requiring licensed professionals to design and construct, we find that practical considerations also require including this street work project within the term "structure."

Although not applicable to this case, we note that Title 48 of the Arizona Revised Statutes proscribes exceptions to the competitive bidding process and lends credence to Achen–Gardner's argument. Title 48 specifies the authority for public street improvement districts by municipalities and mandates competitive bidding procedures. A.R.S. §§ 48–581 and –584. These statutes require a municipality contemplating public street improvements to solicit sealed bids, publicly open those bids, and reject all except the lowest responsible bid. This procedure is consistent with our interpretation of the requirements of Title 34.

Other jurisdictions have also interpreted "structures" to include street improvements.[4] Additionally, other jurisdictions have held projects of a similar nature to be structures.[5] We hold that the public street improvements at issue qualify as "structures" under A.R.S. § 34–201 and therefore, fall within the purview of Arizona's bidding statutes.

## III. COMPETITIVE BIDDING AND DEVELOPMENT AGREEMENT STATUTES

■ We next address the question of whether the public street improvement project undertaken by Chandler through a development agreement with Jeri–Co is subject to Title 34.

The purposes underlying the competitive bidding and award provisions of A.R.S. § 34–201 to –226 are to promote competition, to guard against favoritism, fraud and corruption, and to secure the best construction work at the lowest price practicable. *Rollo,* 120 Ariz. at 474, 586 P.2d at 1286. Whenever public funds are to be used to pay for work and improvements upon public roads, the public works statutes must be satisfied. *See Secrist,* 6 Ariz.App. at 106, 430 P.2d at 452.

---

**4.** *Village of Niles,* 371 Ill. at 625–26, 21 N.E.2d at 747 (an improved public street is a structure); *City of Rock Island,* 287 Ill. at 80, 122 N.E. at 83 (a public street is a structure); *State v. Coda,* 103 W.Va. 676, 138 S.E. 324 (1927) (found an improved highway is a structure); *State v. Royal Indemnity Co.,* 99 W.Va. at 287, 128 S.E. at 443 (an improved highway is a structure).

**5.** Colorado: *Clark v. Town of Estes Park,* 686 P.2d 777, 779 (Colo.1984) (en banc) (parking lot is a structure); Louisiana: *Beyt v. Woodvale*

*Place Apartments,* 297 So.2d 448, 450 (La.1974) (hard-surfaced boulevard built to provide entrance and exit to apartment complex is a structure); Missouri: *Easy Living Mobile Manor, Inc. v. Eureka Fire Protection Dist.,* 513 S.W.2d 736, 739 (Mo.1974) (concrete pad is a structure); New Hampshire: *Town of Jackson v. Town & Country Motor Inn, Inc.,* 120 N.H. 699, 700–01, 422 A.2d 1034, 1035 (N.H.1980) (signs are structures); Oregon: *McCormick v. Bertschinger,* 115 Or. 250, 255, 237 P. 363, 365 (1925) (driveway and walks are structures).

■ Municipalities may enter into development agreements with private corporations by resolution or ordinance. A.R.S. § 9–500.05(A). By entering into a development agreement with a municipality to perform public improvements financed from public funds, the private corporation stands in the shoes of that municipality and becomes an "agent" under A.R.S. § 34–101. *See Central Ariz. Water & Ditching v. City of Tempe*, 140 Ariz. 119, 121–22, 680 P.2d 829, 831–32 (App.1984) [hereinafter *CAWDCO*]; *L.G. Lefler v. Tucson Airport Authority*, 141 Ariz. 23, 27–28, 684 P.2d 904, 908–09 (App.1984).

Chandler and Jeri-Co argue that their development agreement under § 9–500.05 is an exception to public bidding laws. Achen–Gardner denies that any language in the statutes expresses such an exception or intent and claims that real parties in interest have not identified any such language. The authority granted by § 9–500.05 to enter into development agreements does not, in the absence of express language, include the authority to ignore provisions required by other statutes dealing with public funds and improvements. Arizona Revised Statutes § 34–201 specifies the competitive public bidding procedures and the required compliance. Section 34–221(A) states "the agent shall enter into a contract with the lowest responsible bidder whose proposal is satisfactory." The Arizona Supreme Court has declared "it is the duty of this court to adopt a construction of a statutory provision which reconciles it with other statutes where such a reasonable harmonizing interpretation is available." *State v. Perkins*, 144 Ariz. 591, 594, 699 P.2d 364, 367 (1985). We must construe the development agreement statute to harmonize with the competitive bidding statutes.

Three exceptions to the public bidding statutes exist:

1. Private, non-profit corporations, such as airport authorities, who "serve the public good" do not always have to follow competitive bidding statutes; but they must act in the public interest by being fair, honest, and prudent and exercising "wise discretion in the awarding of its contracts." *Hertz Driv–Ur–Self System v. Tucson Airport Auth.*, 81 Ariz. 80, 85, 299 P.2d 1071, 1074 (1956). *Cf. Lefler*, 141 Ariz. at 28, 684 P.2d at 909 (TAA was bound by the public works laws because it was spending public funds for a public purpose).

2. Prisons, detention centers, or similar institutions may use inmates to perform public works if advantageous to the public. A.R.S. § 34–201(B).

3. If the public project cost is less than a certain amount (for example, $10,500 during fiscal 1985–1986), public works statutes would not apply. A.R.S. § 34–201(C)(2).

Arizona Revised Statutes § 9–500.05 only provides general limitations on the scope of a development agreement. We find no expression of any legislative intent to carve an exception to the bidding statutes, and therefore, construe § 9–500.05 to be consistent with the low bid mandate of Title 34. *See Secrist*, 6 Ariz.App. at 105–06, 430 P.2d at 451–52.

Chandler argues that because the improvements at issue were "necessitated" by the private development of Sun–Tech Center, this street project falls within the private development exception to the bidding statutes. We find Chandler's logic too attenuated and are not persuaded.

In *CAWDCO*, this court previously addressed whether Title 34 applied to private corporations performing public work. *CAWDCO*, 140 Ariz. at 121–22, 680 P.2d at 831–32. Tempe used a private, non-profit corporation as a financing device to contract for construction of a water treatment plant. *Id.* at 120, 680 P.2d at 830. Although this private corporation was the "nominal" owner during the plant's construction, Tempe planned to take title to the plant eventually. *Id.* This court held that the construction work was subject to the public works statutes and enunciated the public policy underlying public works contracts:

Since [laws affecting public works] are based upon public economy and are of great importance to the taxpayers, laws

requiring competitive bidding as a condition precedent to letting the public contracts ought not to be frittered away by exceptions but, on the contrary, should receive a construction always which will fully, fairly, and reasonably effectuate and advance their true intent and purpose, and which avoid the likelihood of their being circumvented, evaded, or defeated.

*Id.* (quoting *Secrist,* 6 Ariz.App. at 106, 430 P.2d at 452). We further found that the only difference in the public works project at issue in *Secrist* was that Tempe used a private corporation to finance the project:

If the issue before us was whether the Corporation could let a contract for construction of a city improvement costing $14,000,000 without competitive bidding when the city revenues were pledged to pay for that construction, *none of us would hesitate in holding that the character of the financier did not change the basic public work nature of the construction and hold that the competitive bidding provisions of the act were applicable.* To do otherwise would "circumvent, evade and defeat" the clear legislative intent that the public policy requirements of the act are applicable to public construction financed with public funds.

We therefore hold that where the sole purpose of using a private corporation to construct a public project is merely a financing vehicle to channel public funds, A.R.S. § 34-221(A)(3) is applicable.

*Id.* at 122, 680 P.2d at 832 (emphasis added).

No evidence supports any assumption that development agreements pursuant to A.R.S. § 9-500.05 are not subject to the public competitive bidding laws.

### A. A Development Agreement May Not Circumvent the Competitive Bidding Process

In *CAWDCO,* we stated that if the works are to be paid for by the public, then they are public in nature, and the public entity simply cannot delegate its duties in such a way as to avoid competitive bidding

procedures. *See CAWDCO,* 140 Ariz. at 122, 680 P.2d at 831. We find a Louisiana case to be instructive on this issue, *Coleman v. City of Bossier City,* 291 So.2d 410 (La.App.1974). Bossier City entered into several refund agreements with subdivision developers. Under the agreements, the developers constructed the water and sewerage facilities according to plans and specifications established by the City. *Id.* at 411. Upon completion, the City and the developers signed a contract whereby the City agreed to take over the facilities and further agreed to reimburse the developers over time out of future revenues. *Id.* The City subsequently defaulted on its payments to the developers, and the developers sued. Although the Louisiana high court allowed the developers to recover in *quantum meruit,* it found that even though "all parties were in the utmost good faith in entering into the agreements," the agreements were void as violating the statutes regulating public contracts where the intent was that the improvements would be transferred to public ownership and paid for from public funds. *Id.* at 412.

■ We think this principle applies to the facts of the instant case. If Chandler planned to pay for public road improvements with public funds, then Chandler had a duty to comply with the competitive bidding statutes. *See* A.R.S. §§ 34–201, –221.

■ Chandler and Jeri–Co claim the method of reimbursement amounts to a special assessment. The development agreement provides that Chandler will reimburse Jeri–Co from sales tax revenues generated by the businesses operating at the development and maintained in a special escrow account. Chandler made no effort to create a special assessment district for these improvements. Even if Chandler had done so, the mode of payment for the work cannot alter its character as public work. *See Highland Park Realty Co. v. City of Tucson,* 46 Ariz. 10, 19, 46 P.2d 641, 644–45 (1935) (improving a public street is public work, and this characterization does not change regardless of whether the project is paid for by special assessments or with general taxes).

Notwithstanding Chandler's characterization, the result of the reimbursement is that the monies paid to the developer brings about a dollar-for-dollar reduction in the sales tax revenues otherwise available to Chandler. The fact that the public improvements were required for an adjacent private development does not render the public works statutes inapplicable. *See School District No. 1 of Pima v. Hastings,* 106 Ariz. 175, 177, 472 P.2d 44, 46 (1970) (where a contract is incompatible with the statute, the statute governs). The work is to be done on the public streets. The agreement provides that the developer will ultimately be reimbursed out of funds which would otherwise go to the public treasury. It is public work.

### B. Public Policy Arguments

Achen-Gardner foresees numerous undesirable effects if the challenged procedure is permitted to continue. It argues that a development agreement giving the developer the discretion to choose the contractor to perform public work could result in at least two evils which our public works statutes seek to eliminate. First, the process used by Chandler under the development agreement could discourage future bidding and lead to higher prices generally for public work. Second, the agreement could operate to put public work in the hands of developers or contractors selected for improper reasons.

Achen-Gardner further argues that by allowing a private developer the unfettered discretion to choose the contractor, the opportunity to commit fraud, collusion and favoritism would be greatly increased. Such unilateral discretion could have a chilling effect upon the public bidding process. Without the guarantee that the contract will be awarded to the lowest responsible bidder, or to any of the bidders, contractors may simply decline to compete for public projects involving such development agreements when they otherwise would submit bids, because the cost and time expended in the bid preparation is too great given the increased uncertainty of award. The result would be a reduced level of

competitiveness among the remaining bidders. It concludes that had Chandler complied fully with the public works statutes by contracting with the lowest responsible bidder, or had Jeri-Co submitted the low bid, all the public policy concerns would probably have been alleviated. While these arguments appear to have some logical basis, the record before us contains no evidentiary premise for these conclusions. Because we find, as a matter of law, that development agreements are subject to the public bidding statutes, we do not attempt to assess the validity of these practical arguments.

## IV. THE CHANDLER CITY CODE

Achen-Gardner argues that Chandler's charter and code require competitive public bidding. Even if this project were not subject to Title 34, we find that Chandler is nonetheless required to use its own competitive bidding procedures. Section 5.14 of the Chandler City Charter expressly provides for competitive bidding of public improvements:

*It is the general intent that open competitive bidding be followed in the purchase of supplies, services, equipment and improvements.* The council shall establish by ordinance a procedure to implement this policy and may determine exceptions thereto.

The council shall accept those bids which, under all circumstances, appear to be in the best interests of the City unless all bids be rejected.

Chandler City Ordinance No. 1286 § 1(4) (Dec. 8, 1983) (emphasis added). Under the law of municipal corporations, provisions of a municipal charter cannot be superseded by ordinance. *See Kendall v. Malcolm,* 98 Ariz. 329, 334, 404 P.2d 414, 418 (1965) (city charter bears same relation to ordinances as the constitution of the state bears to its statutes).[6]

Various Chandler City Code sections confirm the general rule of competitive bidding. Section 2–44.3 of the Code creates a purchasing division to oversee the purchase of supplies, services, equipment, and con-

---

**6.** *See also* 5 McQuillin *Municipal Corporations* § 15.19 at 98 (3d ed. 1989), which states:

The charter of the city is the organic law of the corporation, being to it what the constitu-

struction for Chandler. The city manager is mandated to "establish bidding procedures for purchase of supplies, services, equipment, and construction." Chandler City Code § 2–44.4 (emphasis added). In the absence of a valid ordinance setting out an exception, if such is even possible, the Chandler City Charter mandates competitive bidding for projects such as this one. The Arizona Supreme Court has declared that bidding requirements in municipal codes must be construed according to the underlying purpose of the provision, which is to "promote competition, guard against favoritism, fraud and corruption, and to secure the best work or supplies at the lowest price practicable." *Rollo*, 120 Ariz. at 474, 586 P.2d at 1286. We conclude that the Chandler council did not by the ordinance exempt this project from competitive bidding procedures and that the Chandler municipal code requires competitive bidding for the public street improvements at issue.

## V. CONCLUSION

For the foregoing reasons, we grant the relief requested, and direct the superior court to (1) enjoin Chandler from reimbursing Jeri–Co for the public street improvements unless the competitive bidding laws under Title 34 are followed, and (2) award Achen–Gardner attorneys' fees and costs below.

It is further ordered awarding Achen–Gardner its attorneys' fees and costs of appeal pursuant to Rule 4(f) Arizona Rules of Procedure for Special Actions.

KLEINSCHMIDT and EUBANK, JJ., concur.

tion is to the state, and the charter bears the same general relation to the ordinances of the city that the constitution of the state bears to the statutes. Neither the municipal legislative body nor the mayor may disregard charter mandates or procedures at any time, nor do past variations and looseness, be they occasional or frequent, lend an aura of respectability or legality to any other mode of practice.

The proposition is self-evident, therefore, then an ordinance must conform to, be subordinate to, not conflict with, and not exceed the charter, and can no more change or limit the effect of the charter, and can no more change or limit the effect of the charter than a legislative act can modify or supercede a provision of the Constitution of the State.